Doris McDANIEL, Plaintiff-Appellant,

v.

ESSEX INTERNATIONAL, INC., a/k/a Essex Wire, and Lodge 982, International Association of Machinists and Aerospace Workers, Defendants-Appellees.

No 76–1674.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 7, 1977.

Decided Feb. 22, 1978.

Lee Boothby, Berrien Springs, Mich., for plaintiff-appellant.

Thomas J. Kircher, Cincinnati, Ohio, John O'B. Clarke, Jr., Washington, D. C., for Local Lodge 982.

Abner W. Sibal, Joseph T. Eddins, Jr., Beatrice Rosenberg, Raj K. Gupta, Equal Employment Opportunity Comm., Washington, D. C., for amicus curiae E.E.O.C.

Robert J. Chovanec, John D. Tully (Essex Internat'l.), Warner, Norcross & Judd, Grand Rapids, Mich., Gordon J. Quist (Local 982), Miller, Johnson, Snell & Cummisky, Grand Rapids, Mich., Daniel W. Rudy, Frederick F. Thornburg, Thornburg, McGill, Deahl, Harman, Carey & Murray, South Bend, Ind., Frank L. Gallucci, Essex Group, Inc., Fort Wayne, Ind., for defendants-appellees.

Before LIVELY and KEITH, Circuit Judges, and NEESE,* District Judge.

LIVELY, Circuit Judge.

This is an appeal by a Seventh-day Adventist who was discharged by her employer for refusing to pay union dues. One of the questions presented is whether section 8(a)(3), (b)(2) of the Taft-Hartley Act, 29 U.S.C. § 158(a)(3), (b)(2) (1970)[1] represents

---

* The Honorable C. G. Neese, Judge, United States District Court for the Eastern District of Tennessee, sitting by designation.

1. § 158

(a) It shall be an unfair labor practice for an employer—

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of

an accommodation to the religious beliefs and practices of an employee who adheres to the doctrine of a church which teaches that its members should refrain from joining unions and paying union dues.

The employer, Essex International, Inc. (Essex), entered into a collective bargaining agreement (the agreement) with the International Association of Machinists, Local Lodge No. 982 (IAM) prior to the time of plaintiff's employment. The agreement contained a union security clause which required employees to join IAM within 45 days after employment began and to pay an initiation fee and regular dues. The plaintiff advised both Essex and IAM that her religious convictions prevented her from complying with the union security provision of the agreement. The plaintiff requested Essex and IAM to make an accommodation to her religious beliefs and suggested that she would be willing to contribute an amount equal to the union dues to a non-sectarian charity to be chosen by Essex and IAM. Neither Essex nor IAM responded to the plaintiff's requests and she was discharged on December 28, 1972.

This action was brought under Title VII of the Civil Rights Act of 1964, as amended (the Act), 42 U.S.C. §§ 2000e, et seq. Section 703(a) of the Act, 42 U.S.C. § 2000e–2(a), makes it an unlawful employment practice for an employer to discriminate against any individual in employment matters because of that person's religion. Section 703(c)(3), 42 U.S.C. § 2000e–2(c)(3), makes it an unlawful employment practice for a union "to cause or attempt to cause an employer to discriminate against an individual in violation of this section." In her complaint the plaintiff charged that both Essex and IAM refused to make any accommodation to her sincerely held religious beliefs. She sought reinstatement to her former employment, back pay, damages and injunctive relief and an allowance of attorney fees. In other counts she sought the same relief, claiming violation of her rights under the First, Fifth, Ninth and Fourteenth Amendments to the Constitution of the United States and violation of the Michigan Constitution and Fair Employment Practices Act.

Essex filed an answer in which it denied that plaintiff's civil rights had been violated and set forth the provision of the union security clause which required it to discharge any employee within three days after notification by IAM that such employee was not in good standing. IAM filed a motion to dismiss under Rule 12(b), Fed.R. Civ.P., for failure to state a claim upon which relief may be granted, or in the alternative, for summary judgment. Essex joined in this motion. The basic contention of IAM throughout this litigation was stated in its motion:

such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

. . . whatever religious interests may be involved must be subordinated to the clear intent of Congress to sponsor a sharing of the total cost of collective bargaining among all who are represented.

This argument perceives the provisions of Taft-Hartley which permit a collective bargaining agreement to require union membership as a condition of employment but prevent discharge at the behest of a union for any reason other than failure to pay uniformly charged dues as an accommodation to religious scruples against union membership. The defendants rely on cases that arose before the effective date of the 1964 Act which held that the "fair share" requirements of the Taft-Hartley Act and the Railway Labor Act were within the power of Congress under the Commerce Clause and did not violate the First or Fifth Amendments. *Railway Employes' Dept. v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); *Hammond v. United Papermakers*, 462 F.2d 174 (6th Cir.), *cert. denied*, 409 U.S. 1028, 93 S.Ct. 464, 34 L.Ed.2d 322 (1972); *Gray v. Gulf, M. & O. R. R. Co.*, 429 F.2d 1064 (5th Cir. 1970), *cert. denied*, 400 U.S. 1001, 91 S.Ct. 461, 27 L.Ed.2d 451 (1971). It is the contention of the defendants that the 1964 Act merely extended to employees of private employers the protection against religious discrimination afforded public employers by the First Amendment and that practices which do not offend the Constitution do not violate the Act.

The plaintiff's position is that reliance on earlier cases is error. She contends that the present case must be decided on the basis of the 1964 Act, and particularly § 701(j), 42 U.S.C. § 2000e(j) (1970 Supp. II), added as an amendment in 1972, which provides:

(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

The district court held that the complaint failed to state a claim "as a matter of law" and entered summary judgment for both Essex and IAM upon a finding that there were no disputed facts. The district court cited *Hammond, supra*, in disposing of plaintiff's claim of infringement of First Amendment rights. The court concluded that Congress had reduced the union shop requirement to its "financial core" by the enactment of subsections 8(a)(3) and (b)(2). Treating the duty of all employees to pay dues to a duly certified union as nothing more than a tax in support of the union's collective bargaining efforts, the district court held that any resultant infringement of an individual employee's free exercise of religion is "limited and must be subordinate to the compelling governmental interest in favor of such a tax."

The court concluded that Title VII does not require a different result. It found that the "business purpose" of a union is served by union shop agreements and that it would work an undue hardship upon a union and its members to require it to waive its right to have all employees pay their "fair share" of union expenses. The court further held that the accommodation required by section 701(j) is subject to a balancing of interest and that "Congress effected the reasonable accommodation required by Title VII when it balanced the competing interests in enacting the union shop provisions of the Taft-Hartley Act of 1947."

No affidavits or other materials were filed by either defendant and the allegation of the complaint that both refused to make any accommodation to the plaintiff's religious beliefs must be accepted as true on the motion to dismiss. The question before this court is whether the district court was correct in holding that no accommodation was required beyond that effected by Congress in defining the requirements of union security agreements. We hold that § 701(j) requires that a reasonable accommodation be made or a showing that to do so would work an undue hardship. No such showing appears in this record.

This court's treatment of Title VII cases involving Sabbatarian claims provides no clear pattern as to the exact degree of accommodation required. However, none of our opinions may be read as excusing an employer from making any effort to accommodate the religious beliefs of an employee. See *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515 (6th Cir. 1976); *Reid v. Memphis Publishing Co.*, 521 F.2d 512 (6th Cir. 1975); *Cummins v. Parker Seal Co.*, 516 F.2d 544 (6th Cir. 1975); *vacated and remanded*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 347 (1977). *Cf., Dewey v. Reynolds Metals Co.*, 429 F.2d 324 (6th Cir. 1970), *aff'd.* by an evenly divided court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971). In *Trans World Airlines v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the Supreme Court dealt with a claim that an employer violated Title VII by requiring a Sabbatarian to work on Saturday. The Court found that the employer had satisfied its obligation to make a reasonable accommodation. In so holding, however, the Court construed § 701(j) to require some effort to accommodate an employee's religious needs. Referring to a case in which an employer "had not made any effort whatsoever" at accommodation it stated, "It is clear from the language of § 701(j) that Congress intended to change this result by requiring some form of accommodation . . . ." 432 U.S. at 74, n. 9, 97 S.Ct. at 2272. In the same footnote referring to this court's decision in *Dewey v. Reynolds Metals Co., supra*, the Court wrote, "Clearly, any suggestion in *Dewey* that an employer may not be required to make *reasonable* accommodation for the religious needs of its employees was disapproved by § 701(j) . . . ." (emphasis in original) *Id.* It is clear from the language of § 701(j) that it applies to all religious observances and practices and is not limited to claims of discrimination based on requirements of Sabbath work.

In enacting § 701(j) in 1972 Congress made no reference to § 8(a)(3) of the 1947 Taft-Hartley Act. There is no indication in the text or legislative history of Taft-Hartley that Congress intended either subsection 8(a)(3) or 8(b)(2) to strike a balance between the religious needs of individual employees and the security requirements of unions. The closed shop was outlawed; the union shop was permitted, with the limitation that a union could require an employer to discharge an employee only for failure to pay dues. The compromise was between the abuses of compulsory unionism and the problem of "free riders," as the Supreme Court pointed out in *N. L. R. B. v. General Motors Corp.*, 373 U.S. 734, 740, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963), where it stated:

These additions were intended to accomplish twin purposes. On the one hand, the most serious abuses of compulsory unionism were eliminated by abolishing the closed shop. On the other hand, Congress recognized that in the absence of a union-security provision "many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share of the cost." S.Rep.No. 105, 80th Cong., 1st Sess., p. 6, 1 Leg.Hist. L.M.R.A. 412. Consequently, under the new law "employers would still be permitted to enter into agreements requiring all the employees in a given bargaining unit to become members 30 days after being hired," but "expulsion from a union cannot be a ground of compulsory discharge if the worker is not delinquent in paying his initiation fee or dues." S.Rep.No.105, p. 7, 1 Leg.Hist. L.M.R.A. 413. The amendments were intended only to "remedy the most serious abuses of compulsory union membership and yet give employers and unions who feel that such agreements promoted stability by eliminating 'free riders' the right to continue such arrangements." *Ibid.* As far as the federal law was concerned, all employees could be required to pay their way. The bill "abolishes the closed shop but permits voluntary agreements for requiring such forms of compulsory membership as the union shop or maintenance of membership . . . ." S.Rep.No.105, p. 3, 1 Leg.Hist. L.M.R.A. 409.

See also *N. L. R. B. v. Hershey Foods Corp.*, 513 F.2d 1083 (9th Cir. 1975).

Two comments of Senator Taft during debate on the provision of section 8(a)(3) are illuminating. The record describes two examples of union abuse sought to be remedied:

1. prohibiting the union from firing an employee because he testified truthfully that he saw a union shop steward knock another employee down;
2. prohibiting unions from making rules that exclude from membership anyone not the son of a man already working in that plant and already a member of that union.

93, Part IV Cong.Rec. at 4886 (1947). Referring to these examples Senator Taft explained the reach of the present section 8(a)(3) in a statement,

There are also many abuses in connection with the firing of men. We further provide in the bill that if a man is fired by the union for some reason other than nonpayment of dues, the employer does not have to discharge him. The abuse at which that provision is aimed is the usual type of abuse, *and is the only type of abuse testified to.* We have taken care of that in the committee bill. (emphasis added).

and in answer to a question by Senator Donnell:

Mr. DONNELL. Is it not true that if it is deemed unduly restrictive for an employer to agree that he will not employ a man unless the man is already a member of the union it is equally restrictive upon the rights of the employee to provide that the employer can make an agreement by which he will not employ a man unless the man joins an organization which perhaps he may not wish to join?

Mr. TAFT. I do not think I can go any further than to say that so far as the so-called legal principle of constitutional right is concerned, there is no distinction between the two cases, but as a practical matter the one system has led to very serious abuses and the other system has not led to such serious abuses. In this bill we are trying to be strictly practical and to meet the actual problems which have arisen, *and not to go into the broader fields of the rights of particular persons.* (emphasis added).

93 Cong.Rec. at 4886 (1947).

There is simply no support in the legislative history for the argument that subsections 8(a)(3) and (b)(2) were intended to accommodate the religious practices, beliefs or observances of individual employees.

■ This court is aware of the national policy of promoting labor peace which is served by the union security provisions of Taft-Hartley. Since July 2, 1964, however, there has been no national policy of higher priority than the elimination of discrimination in employment practices. See *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Section 701(j) of the 1964 Act requires more than reliance on Taft-Hartley. The union security provisions of Taft-Hartley do not relieve an employer or a union of the duty of attempting to make reasonable accommodation to the individual religious needs of employees. See *Cooper v. General Dynamics*, 533 F.2d 163 (5th Cir. 1976), *cert. denied, sub nom., International Association of Machinists and Aerospace Workers v. Hopkins*, 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1091 (1977).

The burden is on Essex and IAM to make an effort at accommodation and, if unsuccessful, to demonstrate that they were unable to reasonably accommodate the plaintiff's religious beliefs without undue hardship. The district court found that it would work an undue hardship on IAM to forego dues payment by the plaintiff. There is no factual basis in the record for this conclusion. In *Draper v. U. S. Pipe & Foundry Co.*, supra, this court expressed its skepticism concerning "hypothetical hardships" based on assumptions about accommodations which have never been put into practice. 527 F.2d at 520. In addition to her suggestion that she pay an amount equal to the IAM dues to a non-sectarian charity, the plaintiff offered during the district court proceedings "to pay to the union only an amount equivalent to the percentage of the union dues which is equal to the per-

centage of the union budget" used for purposes which do not violate her religious beliefs. The remainder of the stated dues would be paid to a charity. This is similar to a possible accommodation noted by the Supreme Court in *Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). The district court did not deal with this suggested solution to the present controversy.

The undue hardship relied upon by Essex is the fact that it would have been guilty of a violation of the collective bargaining agreement if it had failed to discharge plaintiff upon notification by IAM of her failure to pay union dues. The district court made no specific finding of undue hardship with respect to Essex.

In enacting section 701(j) Congress explicitly required a balancing between the religious needs of the individual and the legitimate business needs of an employer. By implication the same balancing applies to the needs of a union, at least where a claim of discrimination arises from the enforcement of terms of a collective bargaining agreement. See *Trans World Airlines, Inc. v. Hardison, supra*, 432 U.S. at 70, n. 5, 97 S.Ct. 2264. The constitutionality of section 701(j) has not been questioned in these proceedings. Therefore, the task of the district court on remand is to receive evidence and to determine therefrom whether any reasonable accommodation to the religious needs of the plaintiff may be made by Essex and IAM without undue hardship.

The judgment of the district court is reversed, and the cause is remanded for further proceedings.