**Doris McDANIEL, Plaintiff,**

**v.**

**ESSEX INTERNATIONAL, INC., aka Essex Wire, a Michigan Corporation, and International Association of Machinists, Local Lodge No. 982, Defendants.**

**No. K74–288 C.A.**

United States District Court,
W. D. Michigan, S. D.

March 12, 1981.

---

Boothby, Huff & Yingst, Berrien Springs, Mich., Lee Boothby, Berrien Springs, Mich., of counsel, for plaintiff.

Gallucci & Hopkins, Fort Wayne, Ind., William Hopkins, Fort Wayne, Ind., of counsel, for Essex Intern.

Highsaw, Mahoney & Friedman, Washington, D. C., Clinton J. Miller, III, Washington, D. C., of counsel, for defendant Union.

## OPINION

FOX, District Judge.

This case involves a claim by the plaintiff, Doris McDaniel, that her employer, Essex International, Inc., and the union local representing the employees at the Essex plant in Berrien Springs, Local Lodge No. 982 of the International Association of Machinists, violated her rights as set out in Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., 2000e–2, 2000e(j),

by discharging her and causing her discharge because of her religious beliefs. Specifically, plaintiff refused to join the union or pay fees equal to the entire amount of union dues, and, on the insistence of the union, the company discharged her.

This case is presently before the court on remand from the Sixth Circuit Court of Appeals. 571 F.2d 338 (6th Cir. 1978). In that opinion, the Court of Appeals reversed a decision of the district court granting summary judgment to the defendants based on the statutory language. In this appellate decision, the court held that § 701(j) required that defendants make a reasonable accommodation to plaintiff's religious beliefs and, if no reasonable accommodation could be agreed to, make a showing that to accommodate plaintiff would result in undue hardship. Since there was no discussion of those requirements on the record, the case was remanded to this court in order to "receive evidence and to determine therefrom whether any reasonable accommodation to the religious needs of the plaintiff may be made by Essex and IAM without undue hardship." 571 F.2d at 344. While noting that the exact degree of accommodation required is not certain, the Court stated that no prior opinion excuses an employer or a union from making an effort at accommodation. 571 F.2d at 342. "The burden is on Essex and IAM to make an effort at accommodation and, if unsuccessful, to demonstrate that they were unable to reasonably accommodate the plaintiff's religious beliefs without undue hardship." 571 F.2d at 343. The Court of Appeals also reiterated its skepticism of "hypothetical hardships" raised in justification of a failure to reach accommodation. 571 F.2d at 343, citing *Draper v. U. S. Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975).

Though this case was appealed and remanded on this court's summary judgment decision, it is presently being considered on the merits after the parties stipulated to all relevant facts. There are two major areas of legal argument involved in this case. The first revolves around the language and burdens of section 701(j): were there efforts by defendants to come to a reasonable accommodation with plaintiff; is it necessary for defendants to show a good faith effort toward an accommodation before they can argue the "undue hardship" defense; was there an undue hardship to the defendants in accommodating the plaintiff? The second area, the defendants' establishment clause challenge to the constitutionality of section 701(j) as applied in this case, can be addressed only if this court finds in favor of the plaintiff on the statutory questions.

Before beginning an analysis of the legal questions outlined above, it is necessary to lay out the factual situation of this case as agreed to by all the parties. Additional relevant facts will be brought up in discussion of particular legal issues.

Plaintiff began working for Essex International in its plant in Berrien Springs on October 15, 1972. Plaintiff's job classification was one that was covered by a collective bargaining agreement between Essex and IAM Local No. 982 which included a union security provision requiring membership in the union as a condition of employment. (Agreed Statement of Facts ¶ 9.) The plaintiff was at the time of her employment, and still is, a member of the Seventhday Adventist Church. (ASF ¶ 11.) Included in the practices and beliefs of the church is a prohibition against union membership and financial support of labor organizations. There is no question in this case as to the sincerity of plaintiff's beliefs. Plaintiff and various church officials informed the company and the union of plaintiff's religious reservations towards paying union dues and the related position of the church itself. Plaintiff's pastor sent a letter to Essex on December 19, 1972, with a copy to the Local, requesting that plaintiff be allowed to contribute an amount equal to her union dues to a non-sectarian, non-union national charity located in the Berrien Springs area in lieu of her union dues. (ASF ¶ 15.) On December 22, 1972, however, the union submitted a written demand to the company to terminate plaintiff. (Plaintiff's exhibit 9, defendant's exhibit 1.)

The Essex plant manager requested on December 26, 1972 that the termination date of December 28, 1972 be postponed for two weeks to allow some time to reach an accommodation. (Plaintiff's exhibit 6, defendant-Essex's exhibit 2.) The union refused and insisted that plaintiff be discharged on December 28, 1972. (Plaintiff's exhibit 7, defendant-Essex's exhibit 3.) On December 28, 1972, plaintiff sent a letter to the Local president offering to pay the union the proportionate cost of peaceful collective bargaining, with the remainder going to a mutually agreeable, non-religious charity. (ASF ¶ 17.) This offer was never responded to. Also on December 28, a regional leader of the Seventh-day Adventist Church appealed directly to the president of the IAM for intervention. This petition was eventually rejected on January 2, 1973. (ASF ¶ 18.) Further, the defendant-union rejected any proposed accommodation with plaintiff that included non-membership or non-payment of dues. The union did not insist on membership but did insist on the payment of dues and fees. (ASF ¶ 20.) On December 28, 1972, plaintiff was discharged by the company for failure to join the union or to pay dues and fees to the union.

It has been stipulated by the parties (ASF ¶ 26) and recognized by the Court of Appeals in this case, 571 F.2d at 343, that the loss of plaintiff's dues does not constitute an undue hardship to the union. It has also been agreed that no employee or prospective employee of Essex's Berrien Springs plant, except Mrs. McDaniel, had sought an accommodation for religious beliefs proscribing union membership or financial support. (ASF ¶ 29).

Since the parties agree that the plaintiff has established a *prima facie* case of religious discrimination under the Civil Rights Act of 1964, as amended, the initial question for determination by this court is whether the defendants have met their statutory and stipulated burden to show that they each made a good faith effort at accommodation and, if unsuccessful, to demonstrate that they were unable to accommodate plaintiff without undue hardship. *McDaniel v. Essex International, Inc.*, 571 F.2d 338, 343; Final Pretrial Order p. 3.

A preliminary issue that must be decided is whether defendants must actually show their good faith attempt to accommodate before they are entitled to raise the undue hardship excuse. Plaintiff argues that defendants did not make such an attempt and, therefore, should not be allowed to raise any undue hardship as a defense.

In support of this position, plaintiff cites the law of this case, as stated by the Sixth Circuit, that the burden is on the company and the union "to make an effort at accommodation and, if unsuccessful, to demonstrate that they were unable to reasonably accommodate the Plaintiff's religious beliefs without undue hardship." 571 F.2d at 343. Additionally, *Claybaugh v. Pacific Northwest Bell Telephone Co.*, 355 F.Supp. 1, 6 (D.Ore.1973), holds that though "[t]he requirement upon an employer to make a reasonable accommodation to the religious needs of an employee is not unbending . . ., an employer cannot sustain its burden of showing undue hardship without first showing that it made an accommodation as an attempted remedy. As the degree of business hardship increases, the quantity of conduct which will satisfy the reasonable accommodation requirement decreases."

The applicable statutory language is less clear than these cases, however. Discrimination on the basis of religion is forbidden "unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

 Nevertheless, it is the opinion of this court that proof of an effort by the defendant to accommodate the religious practices of an employee is required before that defendant can be allowed to raise the further defense of undue hardship.

 *Burns v. Southern Pacific Transportation Company*, 589 F.2d 403 (9th Cir. 1978), *cert. den.* 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979), is quite clear on this

point. Once the plaintiff has established a *prima facie* case of religious discrimination, as was done in the principal case, "the burden was on the Company and the Union to prove that they made good faith efforts to accommodate Burns' religious beliefs, that the efforts were unsuccessful, and that they were unable reasonably to accommodate those beliefs without undue hardship." 589 F.2d at 405. That Court went on to state that the Supreme Court in *T.W.A. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), held that Congress, in enacting section 701(j), was requiring some form of accommodation and that it intended "to change prior case law which had condoned an employer who 'had not made any effort whatsoever to accommodate the employee's religious needs.' [432 U.S. at 74, n.9, 97 S.Ct. at 2272]" 589 F.2d at 405.

From the facts in the present case, it is clear that the only response of the union to plaintiff's request was to allow plaintiff to pay dues while foregoing actual membership. This, however, cannot be called an accommodation since the union was required by law to extend this consideration to plaintiff. 29 U.S.C. § 158(a)(3); *N.L.R.B. v. General Motors Corp.*, 373 U.S. 734, 742, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670 (1963); *N.L.R.B. v. Hershey Foods Corp.*, 513 F.2d 1083, 1085 (9th Cir. 1975). The principal case is very factually close to the *Burns* case. The Court found there that no attempt at accommodation existed when the defendants merely informed him that his only alternative was to pay dues without joining the union, as provided in the employment contract. This court holds, as did the *Burns* court, that this is no accommodation at all. The union's rejection of even Essex's request for a two week delay in plaintiff's termination indicates the intransigence of the IAM in this matter.

As noted above, the company did seek union approval for an extension of time for the dismissal of plaintiff in order to work out a solution to the conflict between the plaintiff's religious beliefs and the union's security clause. When the union refused to acquiesce to this request the company discharged plaintiff in accordance with the collective bargaining agreement. Though this effort on the part of the company was certainly minimal in degree, it does indicate a certain willingness to resolve the problems raised by plaintiff's religious practices. In contrast, this type of indication is completely lacking in the union's response. It must be remembered in evaluating the company's response to plaintiff's request for an accommodation that there was no chance that the plaintiff could be assigned to a job that was classified outside of the bargaining unit. (ASF ¶ 30.) It appears from the arguments and facts presented to this court that the company had little room to maneuver in arriving at a more extensive offer of accommodation.

■ It is, therefore, the conclusion of this court that only the defendant-company is entitled to proceed to the statutory defense of undue hardship. The defendant-union, having failed in its burden to refute plaintiff's *prima facie* case of religious discrimination, is found liable for a violation of Title VII.

Although under the ruling in the preceding paragraph, this court is of the opinion that the company alone is entitled to raise this defense, this court will also address the union's contentions as a basis for an alternative statutory holding.

Since what constitutes "undue hardship" is not set out in clearly defined parameters, the resolution of this issue turns on the facts of a particular case. What is clear is that "[u]ndue hardship is something greater than [just] hardship." *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975), citing *Cummins v. Parker Seal Co.*, 516 F.2d 544, 551 (6th Cir. 1975). The Supreme Court in *Trans World Airlines v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 2277, 53 L.Ed.2d 113 (1977), may have reduced that standard somewhat by establishing the *de minimis* cost standard, holding that to require T.W.A. to suffer more than a *de minimis* impact in order to accommodate plaintiff constituted an undue hardship. See also *Burns v. Southern Pacific Transportation Co.*, 589 F.2d 403 (9th

Cir. 1978), *cert. den.* 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979).

Another general principle that must be remembered is the skepticism with which hypothetical hardships raised by defendants are viewed. *Burns v. Southern Pacific Transportation Co.,* 589 F.2d 403, 406–7 (9th Cir. 1978); *Draper v. United States Pipe & Foundry Co.,* 527 F.2d 515, 520 (6th Cir. 1975). However, there is apparently room within the principle of undue hardship for situations that do not present an immediate hardship. *T.W.A. v. Hardison,* 432 U.S. at 84, n.15, 97 S.Ct. at 2277, n.15, holds open the door for a finding of undue hardship when there is a "likelihood" that an undue hardship will result. See also *Yott v. North American Rockwell Corp.,* 602 F.2d 904 (9th Cir. 1979).

In the principal case, it has been stipulated by the parties that the loss of plaintiff's dues did not constitute undue hardship to the union. (ASF ¶ 26.) This was affirmed by the Court of Appeals in the earlier appeal of this case and by judicial recognition that accommodations permitting an objecting employee to substitute payment of an amount equal to his union dues to an acceptable charity does not constitute undue hardship. *Burns v. Southern Pacific Transportation Co.,* 589 F.2d 403, 407 (9th Cir. 1978); *Anderson v. General Dynamics Convair Aerospace Division,* 589 F.2d 397, 401–2 (9th Cir. 1978), both *citing McDaniel v. Essex International, Inc.,* 571 F.2d 338 (6th Cir. 1978).

The hardship raised by the union is that there is an unusually high concentration of Seventh-day Adventists in the labor pool area that supplies this Essex plant. The argument made is that this case falls under footnote 15 of *T.W.A. v. Hardison* as presenting a likelihood of serious impact on the financial stability of the union, rather than being a hypothetical hardship. The plaintiff, on the other hand, argues that this defense is a post-complaint creation of the union, that there was no consideration of this "unique" demographic situation.

It is the opinion of this court that, for a number of reasons, there can be no showing of undue hardship by the union in this case. The facts of this case, as stipulated, indicate that the union made no attempt to discover the number of Seventh-day Adventists in the Essex plant, in the hourly factory employee labor pool, or in the Berrien Springs area. (C. Martin deposition, p. 21–24.) While it is true that there is a large number of Seventh-day Adventists in the area (ca. 5200), the vast majority of those working are professional people, self-employed, church employees or students or employees of the two church-related universities in the area. Though the precise number of Seventh-day Adventists in the Berrien Springs area holding hourly factory positions is not precisely stated, the affidavits presented to this court in lieu of live testimony indicate that only approximately fifty-four of the over 5000 church members are so employed. Even more important to this court's conclusion that only a remote hypothetical hardship has been raised is the fact that no other employee or prospective employee, other than Mrs. McDaniel, has ever approached Essex or the IAM seeking such an accommodation. Though the precise quantitative difference between "likely" and "hypothetical" hardship is not certain, the language in *Hardison* does not require a different result in the case presently before this court. In *Hardison,* the defendant's business required it to keep certain departments staffed twenty-four hours a day, seven days a week. The high probability that a large company like T.W.A. would have a substantial number of employees of various faiths who would have religious objections to working Saturday or Sunday was recognized as creating a likely hardship. The situation presented in the present case, with only the remote possibility of a significant number of individuals seeking accommodations to the obligation of paying union dues, clearly falls on the "hypothetical" side of the line.

The union argues that, despite these facts and a lack of effort to discover these facts, its local business agent knew of the high concentration of Seventh-day Adventists in the area and had in his mind this potential

problem in insisting on plaintiff's discharge. What is clear to the court, however, is that the defendant was simply following policy established by the central office of the IAM not to accommodate such religious practices. No evidence has been presented that any special consideration had been given by the Local or the IAM to this unique demographic condition. This is not to say that the union is perpetually locked into this accommodation. If it would become clear, at some point in the future, that this type of accommodation would result in the loss of union dues of a substantial number of individuals, the union would be free to raise undue hardship as a defense for a termination of an accommodation effort.

The company argues that if it had not terminated the plaintiff, Essex would be in violation of the union security clause, exposing it to potential legal liability from the union and its members and, thus, creating an undue hardship on it. In support, the defendant cites *T.W.A. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), for the position that, though "neither a collective-bargaining contract nor a seniority system may be employed to violate the statute, . . . the duty to accommodate [does not require an employer] to take steps inconsistent with the otherwise valid agreement." 432 U.S. at 79, 97 S.Ct. at 2274. The Sixth Circuit opinion in *Hammond v. United Papermakers & Paperworkers Union*, 462 F.2d 174 (6th Cir. 1972), holding that enforcement of a union security provision does not impinge on the plaintiff's free exercise rights under the First Amendment and affirming this court's decision, is raised to point out that the public policy supporting religious practices does not outweigh the union's interest in enforcing a security clause.

Plaintiff's argument is that the rights of plaintiff to accommodation, guaranteed by Title VII, are not rights that can be bargained away by the employer and the union. *Robinson v. Lorillard Corp.*, 444 F.2d 791, 799 (4th Cir. 1971). Her position is that the U.S. Supreme Court's holding in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), requires an employer to look first to the proscriptions of Title VII and then to the collective bargaining agreement. *T.W.A. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), is distinguished since that opinion is limited to seniority clauses which have a specific statutory exemption from the normal requirements of Title VII. 42 U.S.C. § 2000e–2(h). The plaintiff also argues that since any potential lawsuit against the company for failure to dismiss Mrs. McDaniel would derive from an unlawful demand by the union, it was the company's obligation to refuse the demand.

This court is of the opinion that the defendant's reading of the *T.W.A.* case is not controlling in the principal case. The Court in *T.W.A.* was concerned to a large degree with the unfair impact that accommodating the plaintiff in the manner he sought would have on other employers. Specifically, it was recognized that a senior employee would be deprived of her collective bargaining rights in order to accommodate the more junior plaintiff so that T.W.A. could avoid being shorthanded on a particular shift. This, in fact, was the principal issue which T.W.A. and IAM came to the Supreme Court with. 432 U.S. at 83, n.14, 97 S.Ct. at 2276, n.14. In the present case, there is not a comparable substantial burden to be borne by other employees or a substantial cost to be imposed on the employer. This same result was reached by the U.S. Court of Appeals for the Seventh Circuit in *Nottelson v. Smith Steel Workers D.A.L.V. 19806, A.F.L.–CIO*, 643 F.2d 445 (1981).

Though a union security clause is recognized as a valid provision in a collective bargaining agreement, the IAM's blatant refusal to make any kind of accommodation with plaintiff, including even turning down the company's request for a two week delay of the termination, and the obvious non-existence of any substantial hardship, since substituting charitable contributions for plaintiff's union dues certainly was not an undue hardship on the union, put the IAM's actions clearly in the realm of a Title VII violation. Therefore, its demand for plain-

tiff's discharge was invalid and improper. This was not what was intended by the Supreme Court's recognition of an "otherwise valid agreement" and the enforcement of a neutral provision of a collective bargaining agreement. Here, the union's demand and the company's discharge clearly violated plaintiff's rights under Title VII.

Since this court has ruled in favor of the plaintiff and found that the defendants have not shown an inability to accommodate plaintiff's religious beliefs without undue hardship, it must address the constitutional challenge raised by the defendants to the statute itself. Since this case is before this court on remand from the Court of Appeals, before discussing the merits of this issue, it is important to consider whether a constitutional challenge can properly be addressed at this time. It is the opinion of this court that such issues are properly presented and should be dealt with. The initial opinion in this case, written in response to a motion for summary judgment, was based on this court's interpretation of the legal standards of Title VII. Within the confines of the appellate review and remand of the district court's summary judgment decision, the constitutional questions, therefore, were not considered. However, these questions were subsequently raised in a proper fashion in the defendant-union's answer, which was timely filed after the remand order. For this court to be completely precluded from consideration of these issues would not be proper. In a similar situation, the Court of Appeals for the Ninth Circuit recognized plaintiff's right to raise new constitutional issues after remand, even though that case involved review of a completed trial on the merits. *Burns v. Southern Pacific Transportation Co.,* 589 F.2d 403, 408 (9th Cir. 1978). This court does not read the Sixth Circuit's order for remanded proceedings as a rigid limitation on the scope of these proceedings. It is addressed to the proper interpretation of the statute and it noted that the constitutionality of section 701(j) had not been questioned up to that point. That is not to say that such an issue could never be raised in this case. Since this court is of the

opinion that these issues have been properly raised, it is only prudent that these issues be dealt with in the present proceedings rather than being put off until another time.

It is the assertion of the defendants that section 701(j) of the Civil Rights Act of 1964 violates the establishment clause of the First Amendment to the U.S. Constitution. That Amendment's religion clauses state that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof . . . ." It has long been recognized that these clauses contain, to some extent, an internal conflict. In other words, at some point a law guaranteeing a person's right to the free exercise of religion by eliminating burdens and hindrances may become a law that improperly establishes religion. The framers of the First Amendment intended to prevent both government sponsorship of religion and interference with religion. However, as the Supreme Court recognized in *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971), that wall of separation is neither clear nor absolute in its restriction. The overall government attitude toward religion that has developed in accordance with the provisions of the First Amendment is one of "benevolent neutrality." *Walz v. Tax Commission,* 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). The case presently before this court is one in which the tensions of the two clauses clearly come into play. On its face, section 701(j) refers to religion and imposes an obligation on employers and unions to take steps to permit an employee to practice his belief, within limits. If evaluated under a First Amendment with only the establishment clause, it would be suspect. However, given the prominence of the free exercise clause and the intentional aims of the Constitution to foster a pluralistic society, this statute must be evaluated on a much different basis. "The limits of permissible state accommodation to religion are by no means co-extensive with the non-interference mandated by the Free Exercise Clause." *Walz v. Tax Commission,* 397 U.S.

664, 673, 90 S.Ct. 1409, 1413, 25 L.Ed.2d 697 (1970).

■ In evaluating an establishment clause challenge, the Supreme Court has developed a "clearly stated, if not easily applied," three-prong test. In order for a statute to be valid, it must have a secular legislative purpose and a primary effect that neither advances nor inhibits religion and the administration of the statute must not result in excessive government entanglements with religion. *Meek v. Pittenger*, 421 U.S. 349, 358, 95 S.Ct. 1753, 1759, 44 L.Ed.2d 217 (1975); *Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 772–73, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973). There is no argument that this is the test that is to be used in evaluating section 701(j). The application of this test, however, is subject to much debate.

The first requirement of a statute challenged under the establishment clause is that it have a secular purpose. It first must be pointed out that there is a great distinction between unconstitutional government sponsorship of religion and constitutionally permitted protection of religious beliefs and practices. As the Supreme Court stated in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972):

> Accommodating the religious beliefs of the Amish can hardly be characterized as sponsorship or active involvement. The purpose and effect of such an exemption are not to support, favor, advance, or assist the Amish, but to allow their centuries-old religious society, here long before the advent of any compulsory education, to survive free from the heavy impediment compliance which the Wisconsin compulsory education law would impose. Such an accommodation "reflects nothing more than the governmental obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall." *Sher-*

*bert v. Verner*, 374 U.S. 398, 409, 83 S.Ct. 1790, 1796, 10 L.Ed.2d 965 (1963).

406 U.S. at 234, n.22, 92 S.Ct. at 1542, n.22.

It is clear from section 701(j) that the purposes were, first, to require that employment decisions be based on merit and not on such an impermissible ground as religion, just as other provisions of Title VII forbid unnecessary consideration of an employee's or prospective employee's race or sex. The purpose of section 701(j), as well as Title VII as a whole, is to eliminate discrimination. The sponsor of this amendment, Senator Jennings Randolph, stated, "[I]t is my desire and I hope the desire of my colleagues, to assure that freedom from religious discrimination in the employment of workers is for all time guaranteed by law." 118 Cong. Record 705 (1972). It is true that Senator Randolph made reference to particular religious groups but this merely indicated the hardship and discrimination suffered by some people and not that the purpose of this amendment was to advance or sponsor a particular religious group. Secondly, it was in accordance with the principles of the free exercise clause of the First Amendment that section 701(j) was added to the Civil Rights Act of 1964. Senator Harrison Williams raised the question of the establishment clause restriction but dismissed it by noting that the objective of the amendment was to promote the constitutional demand to allow the free exercise of religion. 118 Cong. Record 7 (1972). Thus, the purpose of section 701(j) was also to guarantee the free exercise of religion. The Court of Appeals for this Circuit ruled consistently with this holding in *Cummins v. Parker Seal Co.*, 516 F.2d 544 (6th Cir. 1975); affirmed by an equally divided court, 429 U.S. 65, 97 S.Ct. 342, 50 L.Ed.2d 223 (1976), vacated and remanded for reconsideration under *T.W.A. v. Hardison*, 433 U.S. 903, 97 S.Ct. 2965, 53 L.Ed.2d 1087 (1977). The Court held there that:

> [T]he reasonable accommodation rule, like Title VII as a whole, was intended to prevent discrimination in employment. Specifically, the rule was designed to put teeth in the existing prohibition of religious discrimination .... Like the con-

scientious objector exemption [upheld in *Gillette v. United States*, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971)], the reasonable accommodation rule reflects a legislative judgment that, as a practical matter, certain persons will not compromise their religious convictions and that they should not be punished for the supremacy of conscience. Without considering the impact of the free exercise clause, the Court in *Gillette* found a valid secular purpose in the congressional desire to promote and to protect the sort of conscientious action thought to be important in a democratic society. We believed that similar considerations were implicit in the reasonable accommodation rule, which to that extent is sustained by a neutral legislative purpose.

516 F.2d at 552–53.

The second prong of analysis goes to the primary effect of the legislation. In this case, there has been nothing to suggest that the primary effect of this legislation is other than the implementation of the permissible purposes as outlined above. The consequences of section 701(j) are the elimination of discrimination in employment decisions based on religious beliefs or practices and the protection of religious liberty and pluralism as sought in the principles of the free exercise clause. This does not amount to sponsorship or financial support for religion. Rather, it resembles more closely the tax exemption upheld in *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). There the Supreme Court rejected an establishment clause challenge to tax exemptions for non-profit religious organizations. It was precisely to allow religions and religious diversity to exist and to remove burdens on religious beliefs and practices that this exemption was found constitutional. Similarly in the case before this court, it is not the purpose or the effect of section 701(j) to promote or advance a religion or religions in general. The purpose and effect are to allow individuals to choose their religious beliefs or non-beliefs, *Young v. Southwestern Savings & Loan Ass'n.*, 509 F.2d 140 (5th Cir. 1975), free from a coercive environment. This

amendment protects the equal employment opportunities of those individuals whose religious beliefs do not allow them in good faith to conform with the requirements of a secular workplace and majority religious beliefs. As the Court of Appeals stated in *Cummins*, "[T]he primary effect of . . . § 2000e(j) is to inhibit discrimination, not to advance religion." 516 F.2d at 553. The only "aid" to religion is that no excessive cost will be imposed on an individual for the exercise of his beliefs. This indirect "benefit" does not constitute "sponsorship" as prohibited by the First Amendment. *Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 771–72, 93 S.Ct. 2955, 2964, 37 L.Ed.2d 948 (1973); *Cummins v. Parker Seal Co.*, 516 F.2d 544, 553 (6th Cir. 1975).

■ Finally, in order to be constitutionally valid, a statute must not foster excessive entanglement between government and religion. There is no doubt that this statute anticipates, as well as creates, some government-religion involvement. However, involvement and contact alone do not constitute excessive entanglements. *See Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). Unlike situations calling for extensive government monitoring, *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), or judicial involvement in internal church disputes or ecclesiastical law, inquiring into the sincerity of a person's beliefs is not an excessive entanglement. *Gillette v. United States*, 401 U.S. 437, 456–57, 91 S.Ct. 828, 839, 28 L.Ed.2d 168 (1971); *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965). Section 701(j) will certainly require no more doctrinal inquiry than that involved in *Walz* to determine if an entity qualifies for a tax exemption as a religious institution. *Cummins v. Parker Seal Co.*, 516 F.2d 544, 554 (6th Cir. 1975).

As the Court of Appeals for the Sixth Circuit noted in *Cummins* :

> For the most part, the EEOC and the courts will have to determine simply whether the employer has made a reason-

able accommodation and whether an undue hardship will result. These issues will be considered in the labor relations context and their resolution certainly does not necessitate any government entanglement with religion.

516 F.2d 544, 553–54 (6th Cir. 1975).

The recent Seventh Circuit decision in *Nottelson v. Smith Steel Workers*, 643 F.2d 445 (1981), is in agreement with this court's opinion that section 701(j) is constitutional.

As to the matter of a back pay award, counsel for all parties have assured this court that they will be able to compute the amount of back pay themselves if a ruling is made on one issue. That issue pertains to the effect of plaintiff's voluntary termination of the job that she obtained subsequent to her termination at Essex. The facts relevant to this discussion are that plaintiff was working a special six-hour shift for Essex from 9:00 a. m. to 3:00 p. m. This was important to plaintiff in order to care for her two school-aged children. Plaintiff's hourly rate at this time was $1.90. Approximately two weeks after her termination, plaintiff began working in Benton Harbor, about a half hour from her home. Her hours were from 7:00 a. m. to 3:30 p. m. and her wage was $1.85/hour. Plaintiff worked in Benton Harbor from January until June, when she quit because she felt that the additional hours of working and commuting were causing her to neglect her children's needs and because her girls were out of school for the summer. (Plaintiff's deposition p. 36.) It was plaintiff's feeling that there was a need to be with her children. (Plaintiff's deposition p. 44–45, 48.) In September 1973, plaintiff moved to Mt. Pleasant, Michigan in an effort to find suitable employment. She later moved to Owosso, Michigan (1975), Keene, Texas (1978), and Gaston, Oregon (1978). All of these moves appear to have been motivated by a combination of job possibilities for the plaintiff and parochial school opportunities for her daughters.

The question for this court is whether plaintiff's voluntary termination from her Benton Harbor job in June 1973 should be the cut-off date for a back pay award. It is important to note that the purposes of Title VII back pay awards are two-fold. In addition to the prophylactic purpose of spurring on efforts by employers to eliminate inequality of employment opportunities, back pay is awarded to make whole those persons who suffered on account of unlawful employment discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–18, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975). As with all of the assorted remedies of Title VII available to a federal judge, back pay awards are discretionary. The question in this case is not whether plaintiff is entitled to back pay, since *Albemarle Paper* makes clear the general applicability of this relief, 422 U.S. at 421, 95 S.Ct. at 2373, but whether such an award should be ended by plaintiff's subsequent voluntary termination.

The statute, 42 U.S.C. § 2000e–5(g), provides that interim earnings or amounts earnable with reasonable diligence shall operate to reduce the back pay award. There is nothing to suggest that quitting a subsequent job necessarily terminates an injured plaintiff's right to back pay. However, the amounts earnable by plaintiff had she continued her job in Benton Harbor should have the same effect in reducing a back pay award as the amounts actually earned there have. Plaintiff's argument that her subsequent job in Benton Harbor was not "like" employment misses the point of a back pay claim. This section is, as indicated by its own words, designed to replace income lost to plaintiff due to the improper acts of the defendants. There is no requirement that a plaintiff's next job be "like" employment; this is simply an income replacing award. The logical extension of a requirement such as the plaintiff proposes would be to ignore the effect of money actually earned since it was not from "like" employment. Thus, plaintiff's argument that the subsequent job was for eight hours a day rather than six hours and that there was additional travel time is irrelevant to this issue. Other damages resulting from defendants' discriminatory actions must be pled and

proved separately; there is not, however, a corresponding broad presumption in favor of such other monetary awards.

It also is the opinion of this court that the other equitable relief in this case is sufficient to bring about a change in employment practices, especially in light of the widespread accommodation among almost all other unions.

█ In the event that this ruling is not sufficient to allow the parties to arrive at the amount of back pay, a hearing will be scheduled for the presentation of evidence and arguments on the issue of back pay.

Turning to the question of attorney fees, Title VII specifically permits the court to award reasonable attorney fees to the prevailing party in an action under that title. 42 U.S.C. § 2000e–5(k). Further, the Supreme Court in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414–15, 95 S.Ct. 2362, 2370, 45 L.Ed.2d 280 (1975), stated that attorney fees should ordinarily be awarded to the prevailing party in a Title VII action unless special circumstances were present, applying the Title II standard of *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

The defendants in the present case have asserted that there are special circumstances involved which foreclose an award of attorney fees. Defendants claim that this case is controlled by *Sprogis v. United Air Lines, Inc.*, 517 F.2d 387 (7th Cir. 1975), where a denial of attorney fees was upheld. There it was found that plaintiff's union was the real party in interest and that the named plaintiff had simply agreed to act as the party plaintiff. It was the union that had retained plaintiff's counsel, plaintiff had no financial responsibility for fees and costs, and the petition requested that the fee award be paid directly to the union and counsel. Further, the court held that there were three other special circumstances. First, the court held that "this case [did] not represent the typical civil rights claim envisioned by Congress and in the past sponsored by various public interest organizations." Though organization sponsorship is not necessarily fatal, fees are not to be awarded without consideration of the underlying circumstances. Secondly, the fee award sought was not proportionate to the recovery of damages by plaintiff. Thirdly, there was no significant precedential value of this opinion to outweigh the disproportionate relationship between damages and attorney fees. The court did not feel that the litigation of the *Sprogis* claim would save large legal fees in similar cases. 517 F.2d at 391.

Defendants argue that, similarly, the Seventh-day Adventist Church is sponsoring the *McDaniel* litigation since plaintiff's counsel is being paid advancements by the Church. Also, the precedential value is claimed to be minimal because of decisions in the Seventh and Ninth Circuits on the constitutional question. The basic position of the defendants' position, as outlined by IAM's counsel, is that this case is part of an institutional battle between the IAM and the Seventh-day Adventist Church and that the institutional interests of the Church go beyond those of the plaintiff and, thus, an award of attorney fees is neither necessary nor proper.

It is the opinion of this court, however, that *Sprogis* and defendants' characterization of the posture of this case are not controlling. Contrary to what the court in *Sprogis* found, this case is not one where the supporting organization is the real party in interest. There is no evidence that plaintiff is not financially responsible for the costs of this litigation. The fact that the Church is advancing attorney fees to counsel is not, of itself, fatal. Plaintiff has retained active control of her case, at one time appealing the decision of this court without assurances of Church support. Further, any award of fees is to be made to the plaintiff rather than paid to the supporting organization, as was requested in *Sprogis*. As the district court stated in *Nottelson v. A. O. Smith Corp.*, 489 F.Supp. 94 (E.D.Wisc., 1980), what the plaintiff intends to do with that money is her business. This district court opinion awarding attorney fees was recently upheld by the Seventh Circuit, 643 F.2d 445 (1981). The fact

that plaintiff may have been put in contact with her attorney, an experienced Title VII lawyer specializing in religious discrimination and religious freedom cases, by an elder of her church does not alter this court's ruling.

Although the total damage award for this single plaintiff will likely not be a large amount when compared with the attorney fee and costs, the significant precedential impact of this case mitigates against a denial of attorney fees. Not only has the *McDaniel* litigation already had a substantial effect on Title VII legislation and litigation, but this court's rulings on "reasonable accommodation" and "undue hardship" are important steps in the development of a complete body of Title VII decisional law. Further, *McDaniel* is one of several cases that the Supreme Court will choose from when the constitutionality of section 701(j) is finally to be decided by that tribunal. The three *amicus curiae* briefs filed with the district court in this matter are indications of the importance attached to the McDaniel litigation by other organizations. To assign *McDaniel* no significant precedential value is simply not realistic.

Therefore, it is the opinion of this court that the plaintiff in this action is entitled to reasonable attorney fees for the time that counsel expended on the preparation of this case. The defendants have raised no objections to plaintiff's standard for the calculation of attorney fees (reasonable hourly charge plus expenses) or Mr. Boothby's presentation of that amount. While these figures are not yet binding on the parties, it is this court's hope that the parties can enter into a stipulation on the precise amount of the fees and costs after the release of this court's opinion.

In her complaint, plaintiff also sought reinstatement with full seniority as well as actual and exemplary damages. These items were not discussed or argued in the presentations to the court. In view of the long lapse of time since the filing of this complaint and the absence of argument on these issues, the court is reluctant to rule on these questions. This opinion is basically

one dealing with liability. Therefore, if the parties are unable to resolve the questions of relief, there is still opportunity for them to approach the court for assistance on the issue of proper relief. As with the questions of back pay and attorney fees, it is the hope of this court that the parties can resolve these issues of reinstatement and damages without further need of the court.