EQUAL EMPLOYMENT OPPORTUNI-TY COMMISSION, Plaintiff,

and

Robert Patrick Roesser, Intervenor,

v.

UNIVERSITY OF DETROIT and University of Detroit Professors' Union, Defendants.

No. 86–CV–71389–DT.

United States District Court, E.D. Michigan, S.D.

Dec. 13, 1988.

Stanley H. Pitts, Mimi M. Gendreau, Detroit, Mich., for E.E.O.C.

Bruce N. Cameron, Springfield, Va., David E. Kempner, Detroit, Mich., for Roesser.

Eli Grier, Southfield, Mich., Glen M. Bis, Lansing, Mich., for University of Detroit Professor's Union.

David P. Smith, Bloomfield Hills, Mich., for University of Detroit.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

This is a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* The Plaintiffs, United States Equal Employment Opportu-

nity Commission (EEOC) and Robert Patrick Roesser, claim that Roesser suffered employment discrimination because of his religious beliefs under sections 701(j) and 703(c) of Title VII, 42 U.S.C. §§ 2000e(j), 2000e–2(c), when he was discharged from the faculty of the University of Detroit for failure to pay agency fees to the University of Detroit Professors' Union (UDPU) as required by the collective bargaining agreement (CBA) between the UDPU and the University.

Roesser argues that his religious beliefs forbid him to contribute to the UDPU, or at least to the state and national labor organizations with which it is affiliated,[1] because they espouse a pro-choice position in the abortion debate and support that position with union funds.[2]

The instant case is apparently one of first impression as to whether Title VII requires a private sector union shop to allow an employee to satisfy (a) his union contribution requirement and (b) his religious objections to a particular union activity beyond collective bargaining by substituting charitable contributions for union fees in a proportion greater than that which the union undisputedly expends in furtherance of the activity.

1. The UDPU is affiliated with the Michigan Education Association (MEA) and the National Education Association (NEA). Uncontested Facts, Joint Final Pretrial Order (Pl. 114) ("Pretrial Order"), at 2, Paragraph 3.

2. It appears undisputed that the UDPU did not take a prochoice position on the abortion issue, and made no local expenditures to which Roesser objects. *See* text accompanying n. 6 *infra;* UDPU's Motion for Summary Judgment (Pl. 78) at 4; Invervenor's Trial Brief (Pl. 145) at 8–9.

3. "Agency fees," also called "service fees," are amounts which are ordinarily required to be paid in lieu of union dues for members of an "agency shop" bargaining unit who choose not to join the union. Uncontested Facts, Pretrial Order at 2, Paragraph 3.

By internal union arrangement, most of the dues and agency fees paid by UDPU bargaining unit members are passed on to the MEA and NEA. The allocations for the relevant years are as follows:

| Year | Total fee | UDPU | MEA | NEA |
|------|-----------|--------|---------|--------|
| 1979–80 | $259.10 | $30.00 | $187.10 | $42.00 |

## I.

Robert Patrick Roesser was appointed associate professor of electrical engineering at the University beginning in the 1979–80 academic year. He never joined the UDPU, but paid its required agency fee[3] until April 21, 1982.

On or about that date, Roesser advised the UDPU of his religious objections to the position of the MEA and NEA on abortion,[4] and indicated that because of his religious belief that abortion was wrong, he could no longer pay any fees to support the MEA or NEA. Thereafter, Roesser proposed that he (1) pay an amount equal to his entire agency fee to charity, or (2) remit that portion of his fee which was customarily allocated to the local union, and pay the balance to charity.[5] The UDPU and the University rejected both of these suggestions.

On November 3, 1983, the UDPU formally requested the University to discharge Roesser on May 15, 1984 unless his agency fees were paid on or before that date. On April 9, 1984, the University indicated by letter that it would not consider the UDPU's request unless the union first offered Roesser a rebate in accordance with the procedures in *Abood v. Detroit Board*

| Year | Total fee | UDPU | MEA | NEA |
|------|-----------|-------|--------|-------|
| 1980–81 | 286.20 | 30.00 | 211.20 | 45.00 |
| 1981–82 | 289.20 | 30.00 | 211.20 | 48.00 |
| 1982–83 | 297.00 | 8.50 | 238.50 | 53.00 |
| 1983–84 | 325.50 | 30.00 | 238.50 | 57.00 |
| 1984–85 | 339.40 | 30.00 | 247.40 | 62.00 |
| 1985–86 | 353.40 | 30.00 | 257.40 | 66.00 |

Uncontested Facts, Supplement to Pretrial Order (Pl. 120), at 1.

4. It is undisputed that Roesser saw an article in the Detroit News on November 17, 1981, which described the decision of a Michigan state probate judge to compel an 11–year–old female ward of the court to carry to term a pregnancy which was allegedly the result of rape. Deposition of Robert Patrick Roesser, November 4, 1986, at 64, 100. It is further undisputed that after the judge's decision, the MEA participated in a petition drive whose goal was to remove him from the bench, and that Roesser became aware of the petition drive. Deposition of Robert Patrick Roesser, November 4, 1986 (Pl. 107) ("Roesser Dep."), at 64.

5. Uncontested Facts, Pretrial Order at 4, Paragraph 11.

*of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).

On April 17, 1984, the UDPU sent a written offer of accommodation to Roesser. In its letter, the UDPU proposed to rebate a portion of Roesser's service fee which corresponded to the proportion of the union's budget that was "even remotely connected with the alleged support of issues to which you take exception."[6]

Roesser refused the UDPU offer in an April 23, 1984 letter, in which he stated:

[First,] [r]egardless of the amount of the fee that I might pay, a percentage as estimated will be used to support issues to which I object. The choice I must make is either to pay nothing, in which case no support goes to objectionable issues, or to pay a reduced amount, in which case a percentage goes to the support of objectionable issues. Since I believe that abortion is absolutely wrong I must choose the course that minimizes the support of it. The gravity of this issue is so great that I must consider my job expendable.

The second reason I cannot accept the offer [of rebate] is that the support of objectionable issues is so intertwined throughout MEA/NEA that it cannot be reasonably separated.... The objectionable issues are supported not only by the budgeted amounts but also by the entire weight and influence of the entire MEA and NEA. There is just no dealing with something that is inherently wrong.[7]

On May 15, 1984, Roesser was discharged by the University for his failure to pay the agency fees which were required by the CBA. He filed an administrative complaint with the EEOC against (a) the University on July 3, 1984, and (b) the UDPU on September 14, 1984. The EEOC issued a "reasonable cause" determination against the UDPU and the University on June 11, 1985. The Complaint in this action was filed on April 4, 1986.

On January 16, 1987, the UDPU moved for summary judgment. On the same date, Roesser moved for partial summary judgment on the issue of liability. On May 29, 1987, this Court denied the UDPU's motion for summary judgment and Roesser's motion for partial summary judgment. The Court concluded that questions of a material fact remained as to (a) the nature and sincerity of Roesser's religious objections to any association with the UDPU and/or its state and national affiliates, and (b) whether, and to what extent, Roesser's failure to pay agency fees imposed an "undue hardship" upon the UDPU or the University within the meaning of Title VII.

Thereafter, the UDPU requested reconsideration of the May 29th decision, on the ground that this Court had failed to address, *inter alia,* the questions of reasonable accommodation and undue hardship which had been presented.

This Court has carefully reviewed the record on reconsideration,[8] and determines

---

**6.** Letter from Maryjo Nichols, UDPU President, to Robert Patrick Roesser, April 17, 1984, at 1, Exhibit 12 to Roesser Dep.

The letter enclosed a "reduced service fee calculation worksheet" which computed the rebate at $57.72 for the 1982–83 academic year, and $28.86 for the 1983–84 academic year.

Pro-choice activism was undisputedly a part of the union's work, but the fee reduction which was offered to Roesser included rebates for union expenditures on political, ideological and "social issues" generally, including the entire allocation for the state organization's political action committee, "MEA–PAC," whose activities were not confined to the abortion issue. *Id.*

**7.** Letter from Robert Patrick Roesser to Maryjo Nichols, April 23, 1984, Exhibit 13 to Roesser Dep., at 1.

**8.** In its examination and evaluation of the parties' respective positions, this Court is guided by the standards of its Local Rule 17(m)(3), which reads:

Generally, and without restricting the discretion of the Court, motions for ... reconsideration which merely present the same issues ruled upon by the Court, either expressly or by reasonable implication, shall not be granted. The movant shall not only demonstrate a palpable defect by which the Court and the parties have been misled but also show that a different disposition of the case must result from a disposition thereof.

A reconsideration of the issues, which have been raised by the parties in their respective motions, is warranted because the minimum standards of Local Rule 17(m)(3) have been fully satisfied.

for the reasons, which have been set forth below, that a summary judgment must be granted in favor of the Defendants.

## II.

### A.

█ At the outset, the Court will briefly revisit a lingering dispute between the parties concerning the timeliness of Roesser's EEOC claims. It is uncontroverted that the University sent a letter to Roesser in November 1983 which warned him that he would be discharged in May 1984 unless his agency fees were paid. It is further uncontested that the University informed Roesser in an April 1984 letter that he would be discharged on May 15, 1984 because of his failure to pay the required agency fees.[9] Roesser's employment was undisputedly terminated on May 15, 1984, and the record reflects that he filed his EEOC claims against the University and the UDPU on July 3, 1984, and September 14, 1984, respectively.

Upon reflection, this Court determines that the "discriminatory act," which gave rise to Roesser's Title VII rights, *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980), was his actual discharge from employment. At no time prior to May 15, 1984 was it suggested to Roesser that his termination was final or irrevocable. *See Abramson v. University of Hawaii*, 594 F.2d 202, 208–09 (9th Cir.1979). Moreover, the record clearly shows that negotiations were undertaken during the time between the University's initial notice of termination and Roesser's actual last day of work. For those negotiations to have had any meaning, Roesser's discharge could not have been a foregone conclusion at any time until it actually took place.

The Court believes that the interval between notice and actual termination was of mutual benefit to the parties. Thus, the conclusion is inescapable that Roesser's EEOC rights did not accrue until May 15, 1984, and his complaints to the EEOC against the UDPU and the University were timely under the accrual provision of section 706(e) of Title VII, 42 U.S.C. § 2000e–5(e).

### B.

Although the parties have moved for a summary judgment, each side asserts the existence of disputed fact issues in an attempt to avoid summary judgment for its opponent. In particular, the parties contest (1) the existence of undue hardship, and (2) the sincerity of Roesser's religious beliefs.

Roesser's religious sincerity is averred in (1) a multi-page affidavit which is attached to his motion for summary judgment,[10] and (2) a notarized amendment, dated September 14, 1984, to his formal EEOC charge against the UDPU and the University.[11] In the latter document, Roesser set forth his religious beliefs:

I am a member in good standing of the Catholic Church. The Catholic Church teaches that procuring an abortion is a sin. My understanding of the teachings of the Church, and my personal belief, is that a member of the Church should not campaign in favor of abortion laws, vote for them or collaborate in their application. A member who procures an abortion is at once excommunicated from the Church.

Because of my sincerely held religious beliefs, I may not pay money to the union to support these pro-abortion activities nor may I associate with the union because of these activities.

To contest Roesser's sincerity, the Defendants refer to alleged "inconsistencies" in his behavior. As an example, they cite

---

9. Letter from UDPU to Roesser, April 17, 1984, Exhibit B to EEOC's Supplemental Brief (Pl. 131), at 1 ("As you are no doubt aware, the 270 day notice period required by paragraph 3.8 of the [collective bargaining] agreement will expire on May 15, 1984, after which date your employment will be terminated").

10. Appendix to Intervenor's Memorandum (Pl. 70), Part 1.

11. Amended Charge of Discrimination, September 14, 1984, at 1, Exhibit 5 to EEOC's First Requests for Admissions (Pl. 2).

evidence that he did not limit his search for teaching jobs to those states which prohibited the use of public funds to subsidize abortions. *See International Society for Krishna Consciousness v. Barber*, 650 F.2d 430, 441 (2d Cir.1981) ("an adherent's belief would not be sincere if he acts in a manner inconsistent with that belief").

Such allegations, even if true, do not compel a conclusion that Roesser's religious beliefs were insincere as a matter of law. Indeed, if the question of Roesser's sincerity had been squarely presented, this Court would have declined to hold him to a standard of conduct which would have discounted his beliefs based on the slightest perceived flaw in the consistency of his religious practice. *See Thomas v. Review Board, Indiana Employment Security Division*, 450 U.S. 707, 715, 101 S.Ct. 1425, 1430–31, 67 L.Ed.2d 624 (1981); *cf. Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863–64, 13 L.Ed.2d 733 (1965); *Theriault v. Carlson*, 495 F.2d 390, 394–95 (5th Cir.1974).

■ However, for present purposes, the sincerity of Roesser's religious beliefs is immaterial. Rather, the dispositive question before this Court is whether the accommodation that Roesser seeks in this dispute is required under Title VII.

### III.

#### A.

Section 701(j) of Title VII, 42 U.S.C. § 2000e(j), provides that

[t]he term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

Section 701(j) places labor unions under the same accommodation duty as that which governs the conduct of employers. *Tooley v. Martin–Marietta Corp.*, 648 F.2d 1239, 1242 (9th Cir.), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981); *Cooper v. General Dynamics Convair Aerospace Division*, 533 F.2d 163, 169–70 (5th Cir.1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1091 (1977). Hence, judicial decisions, which have discussed the extent of an employer's accommodation duties under section 701(j), are applicable to both the UDPU and the University in the instant case.[12]

#### B.

The extent of the duty of reasonable accommodation under section 701(j) was specifically addressed in *Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986). In *Philbrook*, a teacher in the Ansonia, Connecticut public school system expressed a desire to observe the special holy days of his religious sect without loss of pay, although the annual number of such holy days exceeded the amount of paid leave which the applicable collective bargaining agreement (CBA) permitted for religious observance. The CBA treated his absences beyond the stipulated limit as unpaid leave. However, the employee sought leave with pay for all of his religious observances,[13] contending that the limitation on religious leave offended his right to a reasonable accommodation under Title VII.

In *Philbrook*, the Court declined to "establish for religious accommodation claims a proof scheme analogous to that developed in other Title VII contexts, delineating the plaintiff's prima facie case and shifting production burdens." *Id.* at 67, 107 S.Ct.

---

**12.** *See* discussion at Part IV *infra*.

**13.** The employee in *Philbrook* made two alternative offers to his employer: (1) that he be permitted to use non-religious leave for religious purposes up to the maximum leave permitted for any purpose under the CBA, and (2) that he "pay the cost of a substitute and receive full pay

for additional days off" for religious observances, presumably up to and beyond the ceiling on leave for any purpose which was provided under the CBA. The employer "consistently rejected both proposals." *Ansonia Board of Education v. Philbrook*, 479 U.S. at 64–65, 107 S.Ct. at 370.

at 371. Instead, the Court held simply that "an employer has met its obligation under section 701(j) when it demonstrates that it has offered a reasonable accommodation to the employee." *Id.* at 69, 107 S.Ct. at 372.

> We find no basis in either the statute or its legislative history for requiring an employer to choose any particular reasonable accommodation. By its very terms the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation. The employer violates the statute unless it "demonstrates that [it] is unable to reasonably accommodate ... an employee's ... religious observance or practice ... without undue hardship on the conduct of the employer's business." ... Thus, where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship.... [T]he extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship.

*Id.* at 68–69, 107 S.Ct. at 372.

The *Philbrook* Court specifically rejected the view of the Second Circuit Court of Appeals which held that "the accommodation obligation includes a duty to accept 'the proposal the employee prefers unless that accommodation causes undue hardship on the employer's conduct of his business.'" *Id.* at 68, 107 S.Ct. at 371, *rev'g Philbrook v. Ansonia Board of Education*, 757 F.2d 476, 484 (2d Cir.1985). Instead, the Court cited with approval the pronouncement by the Court of Appeals for the Fifth Circuit that "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Id.* 479 U.S. at 69, 107 S.Ct. at 372, *quoting Brener v. Diagnostic Center Hospital*, 671 F.2d 141, 145–46 (5th Cir.1982).

*Philbrook* expressed its disapproval of an EEOC guideline, 29 C.F.R. 1605.-2(c)(2)(ii) (1986), which had provided that "when there is more than one means of accommodation which would not cause undue hardship, the employer ... must offer the alternative which least disadvantages the individual with respect to his or her employment opportunities." The Court held, "To the extent that the guideline, like the approach of the Court of Appeals, requires the employer to accept any alternative favored by the employee short of undue hardship, we find the guideline simply inconsistent with the statute." *Id.* 479 U.S. at 69–70 & n. 6, 107 S.Ct. at 372 & n. 6. Thus, it established that where more than one reasonable accommodation to an employee's religious needs is possible, section 701(j) entitles an employee simply to "a reasonable accommodation," but not necessarily the one of his choice.

In addition, *Philbrook* indicated that the employer's proffered accommodation, *i.e.*, unpaid time off for religious observances beyond the stated limit for religious leave, "would generally be a reasonable one," *id.* at 70, 107 S.Ct. at 373, assuming it was not "doled out in a discriminatory fashion." *Id.*, *quoting Hishon v. King & Spalding*, 467 U.S. 69, 75, 104 S.Ct. 2229, 2233–34, 81 L.Ed.2d 59 (1984).

> The provision of unpaid leave eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully [his] religious holy days and requires him only to give up compensation for a day when he did not in fact work.

*Id.*[14]

The teachings of *Philbrook* suggest that, under certain circumstances, an employee's

---

**14.** The *Philbrook* majority did not hold the proffered accommodation to be reasonable as a matter of law, but remanded the case for further proceedings to determine whether the restriction had the effect of discriminating against employees because of their religious needs.

Justice Stevens would not have remanded, because he found no discriminatory effect in the employer's policy. He reasoned that the rules worked to the advantage of employees who could legitimately make requests for both religious and secular leave. *Ansonia Board of*

request may be reasonably accommodated by separating the single benefit sought into two component parts, and offering an accommodation as to one component but not the other. In *Philbrook*, the benefit of time off without disciplinary action was separated from the additional benefit of compensation for the leave in question.

In the instant case, Roesser requested the right to refrain from (1) contributing to a specific cause which he opposes on religious grounds, and (2) making any contribution of financial support to his union because of its position on abortion.[15] Roesser claims that a denial of either of these benefits would constitute unlawful discrimination on the basis of his religious beliefs. However, on the basis of the record in the case at bar, this Court concludes that the UDPU's offer of a proportional rebate of Roesser's dues was a reasonable accommodation within the spirit of *Philbrook*.[16]

C.

In support of his argument that the Defendants' proffered accommodation was insufficient under Title VII, Roesser relies upon *McDaniel v. Essex International, Inc.*, 571 F.2d 338 (6th Cir.1978), *on remand*, 509 F.Supp. 1055 (W.D.Mich.1981), *aff'd*, 696 F.2d 34 (6th Cir.1982), and *Tooley v. Martin–Marietta Corp.*, 648 F.2d 1239 (9th Cir.), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981).[17] The employees in *McDaniel* and *Tooley* were members of the Seventh Day Adventist Church, which taught its adherents against joining labor unions or paying union dues.[18] They sought to avoid contributing agency fees to the unions which were the exclusive bargaining representatives at their places of employment.

In *Tooley v. Martin–Marietta Corp.*, 648 F.2d at 1242, the Court held that a full charitable substitution for employees who had religious objections to the collective bargaining function of labor unions was "consistent with the balancing of interests promoted by section 701(j)," and therefore a reasonable accommodation under Title VII. However, *Tooley* did not hold that such an arrangement was the minimum accomodation required under the statute, even for employees whose religious objections specifically encompassed the union's essential bargaining role.

In *McDaniel v. Essex International, Inc.*, 696 F.2d at 36, 38, the Court held that the union had failed to "make an effort" at reasonable accommodation by declining to consider the employee's offer to contribute her share of collective bargaining expenses and pay the rest of her agency fee to charity.[19] The *McDaniel* Court suggested, but did not hold, that the accommodation which the employee had requested (*i.e.*, "charitable substitution" of portions of her fees which were not allocable to collective bargaining expenses) was reasonable and unlikely to impose an undue hardship upon the union.

It should be noted that *McDaniel* and *Tooley* were rendered before the Supreme Court directly addressed the extent of an employer's accommodation duty in *Anso-*

*Education v. Philbrook*, 479 U.S. at 75, 80, 107 S.Ct. at 375, 378 (Stevens, J., concurring in part and dissenting in part).

**15.** *See* n. 7 *supra* and accompanying text.

**16.** *See* n. 6 *supra*.

**17.** *See also, e.g., Burns v. Southern Pacific Transportation Co.*, 589 F.2d 403 (9th Cir.1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979).

**18.** The Seventh Day Adventist Church instructs its followers that labor unions constitute irreligious "striving," in violation of the Biblical commandment to "love thy neighbor as thyself." *See Hammond v. United Papermakers and Paperworkers Union*, 462 F.2d 174, 175 (6th Cir.), *cert. denied*, 409 U.S. 1028, 93 S.Ct. 464, 34 L.Ed.2d 322 (1972); *Cooper v. General Dynamics Convair Aerospace Division*, 533 F.2d at 166 (Seventh Day Adventist belief that unions are "Godless").

**19.** "On the date of her discharge Ms. McDaniel wrote the president [of her local union] stating that she was not seeking any financial advantage and offering to 'contribute to the proportionate cost of administration of peaceful collective bargaining with [her employer] with the remainder of the normal dues to be given to a mutually-agreeable non-religious charitable fund.'" Stipulation No. 3 on Remand, *cited in McDaniel*, 696 F.2d at 36.

*nia Board of Education v. Philbrook, supra.* However, a more immediate distinction between the *McDaniel* and *Tooley* decisions and the instant case is the nature of the religious objections at issue. The employees in *McDaniel* and *Tooley* had religious objections to the fundamental labor union concept, and believed that they could neither join nor contribute to a movement whose collective bargaining purpose was ostensibly irreligious. Here, Roesser harbors no religious objection to labor unions in general, to the bargaining role of his union in particular, or to any of the public positions of his union with the sole exception of abortion. Hence, neither *McDaniel* nor *Tooley* is apposite to this controversy.

### D.

The parties to the instant cause have presented arguments from an important line of Supreme Court decisions outside Title VII, beginning with *Railway Employes' Dep't v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956). These cases concern the rights of dissenting agency fee payors to exemptions from union dues obligations under the First Amendment and federal labor law. Although these decisions are applicable to the case at bar only by analogy, their message is a powerful one.

*Hanson* and its progeny have clearly established that neither the First Amendment nor the Labor Act requires relieving a dissenting nonmember employee from a duty to contribute to collective bargaining in a union shop.

*Hanson,* the first decision to recognize this basic principle, involved a challenge by railroad workers to the constitutionality of the union shop provisions of the Railway Labor Act, 45 U.S.C. § 152. The Supreme Court held that "the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work is within the power of Congress under the Commerce Clause and does not violate either the First or Fifth Amend-

ments." *Id.,* 351 U.S. at 238, 76 S.Ct. at 721.[20]

At the same time, the *Hanson* Court concluded that its judgment would not control where "the exaction of dues ... is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment," and noted that where "assessments are in fact imposed for purposes not germane to collective bargaining," its judgment might be different. *Id.* at 235, 76 S.Ct. at 720.

In *Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), the Court explicitly held that a proportional rebate to a dissenting nonmember employee would be "appropriate [relief under the Railway Labor Act] to the injury complained of," namely the use of union funds for purposes beyond collective bargaining to which the dissenter "advised the union he was opposed." *Id.* at 775, 81 S.Ct. at 1803. The Court specifically noted,

One remedy would be an injunction against expenditure for political causes opposed by each complaining employee of a sum, from those moneys to be spent by the union for political purposes, which is so much of the moneys exacted from him as is the proportion of the union's total expenditures made for such political activities to the union's total budget. The union should not be in a position to make up such sum from money paid by a nondissenter, for this would shift a disproportionate share of the costs of collective bargaining to the dissenter and have the same effect of applying his money to support such political activities.

*Id.* The Court also indicated that a dissenter ought to receive restitution of those sums, which had been already exacted and expended over his objection, in order to ensure the freedom of dissent, as guaranteed by the Railway Labor Act. *Id.*

In *Railway Clerks v. Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963), the Court reiterated its belief that the nature of a dissenting employee's objection

---

**20.** Because *Hanson* held that the Railway Labor Act preempted contrary state law, it found that labor agreements under the Act constituted state

action and thus implicated the federal Constitution. *Id.* 351 U.S. at 232, 76 S.Ct. at 718 (*see* discussion at n. 24 *infra*).

should determine the proper extent of the relief to be afforded. *Allen* held that "[t]he necessary predicate for [the remedy proposed in *Street*] is a division of the union's political expenditures from those germane to collective bargaining." *Id.* 373 U.S. at 121, 83 S.Ct. at 1163.[21]

Later cases have remained true to the basic principle enunciated in *Hanson, Street* and *Allen.* This allegiance is particularly evident in *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), in which the Court stated:

> An employee may very well have ... objections to a wide variety of activities undertaken by the union in its role as exclusive representative. His moral or religious views about the desirability of abortion may not square with the union's policy in negotiating a medical benefits plan.... But the judgment clearly made in *Hanson* and *Street* is that such interference [with an employee's freedom to associate] is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations advanced by

Congress. "The furtherance of the common cause leaves some leeway for the leadership of the group. As long as they act to promote the cause which justified bringing the group together, the individual cannot withdraw his financial support merely because he disagrees with the group's strategy. If that were allowed, we would be reversing the *Hanson* case, *sub silentio.*"

*Abood,* 431 U.S. at 222–23, 97 S.Ct. at 1793, *citing Machinists v. Street,* 367 U.S. at 778, 81 S.Ct. at 1805 (Douglas, J., concurring).[22]

The *Abood* Court took the universal obligation among union shop employees to support collective bargaining for granted, and dealt only with the constitutional objections to the use of compulsory dues in public employee contracts for union activities beyond collective bargaining. The Court concluded that to condition government employment on unwilling contributions to extra-representational union activities violated dissenting workers' First Amendment guarantees of free expression and association.[23]

---

**21.** In a similar vein, the Fourth Circuit Court of Appeals in *Beck v. Communications Workers,* 800 F.2d 1280, 1287 n. 10 (4th Cir.1986) (*en banc*), *aff'd,* —— U.S. ——, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988), held that where "non-member employees ... voluntarily [chose] ... to use the union as their agent for some purpose unrelated to collective bargaining ... the scope of the union's agency function would be defined by mutual consent." This reasoning reinforces the notion, as announced in *Hanson* and *Abood,* that assessments for collective bargaining and for other purposes are constitutionally different, and that any safeguards for individual expressive freedom are limited by the Congressional mandate that collective bargaining costs are legitimately collectible from all persons who benefit by the union's work.

**22.** It should be noted that, although *Abood v. Detroit Board of Education, supra,* was decided (a) five years after Title VII was amended to require reasonable accommodation for religious objectors, and (b) during the same term as *Trans World Airlines v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), none of the opinions in *Abood* suggest that any special relief might be proper for a nonmember employee with religious objections to a specific union activity beyond collective bargaining.

**23.** In *Abood v. Detroit Board of Education, supra,* the Court sought to determine:

> whether a public employee has a weightier First Amendment interest than a private employee in not being compelled to contribute to the costs of exclusive union representation. *Id.* 431 U.S. at 229, 97 S.Ct. at 1796. The Court concluded, "We think he does not." *Id.* Contrary to Roesser's argument, the *Abood* analysis does not proceed from the premise that public sector employees are entitled to a certain minimum of constitutional protection and then hold that private sector employees have the same protection. Rather, the *Abood* decision reasons from the principle that union shop employees as a group have an obligation to contribute to collective bargaining costs, and then holds that the First Amendment does not confer additional privileges upon employees who are subject to public sector labor agreements. *Id.* at 226, 97 S.Ct. at 1794–95.

> Thus, an essential holding of *Abood* is that neither public nor private sector union shop employees have the right, under the federal Constitution or any federal law, to contest compulsory sharing of the costs of exclusive union representation among all members of the bargaining unit. *Id.* at 235–36, 97 S.Ct. at 1800. *See* discussion *infra,* n. 25.

However, with regard to the extent of an objector's exemption rights, *Abood* employed the same basic assumptions to which federal courts have subscribed since the rendition of the decision in *Railway Employes' Dep't v. Hanson, supra:* (1) each member of a union shop bargaining unit has a duty to contribute his proportionate share of the costs of collective bargaining, and (2) a dissent from union opinions or endeavors beyond collective bargaining is to be redressed by a proportional rebate of amounts exacted for the disapproved activities, and by no further relief.

### E.

In *Chicago Teachers' Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), the Court refined the proportion principle by requiring that public employees receive certain procedural protections [24] in order to ensure a constitutional minimum of fairness and accuracy in the calculation of their rebates. In *Tierney v. City of Toledo,* 824 F.2d 1497 (6th Cir.1987), the Sixth Circuit Court of Appeals followed and expanded upon the holding of *Hudson* by stating that a public employee union "may not claim a right to receive from the nonunion member full union dues covering all expenses except those items which are ideological in purpose. Instead, it may collect only for those expenses affirmatively related to the bargaining agreement." *Id.* 824 F.2d at 1505.

This Court entertained supplemental briefs in the wake of *Tierney* concerning its applicability in the instant case, and now considers the *Hudson* and *Tierney* decisions with the added benefit of the parties' supplemental arguments.

Roesser argues that *Hudson* and *Tierney* impart procedural as well as substantive components to the requirement that the UDPU and the University offer reasonable accommodation to his religious beliefs under Title VII. He argues that the UDPU's rebate offer was inadequate as a matter of law because it (1) did not satisfy his religious objections, and (2) was a product of procedures less rigorous than those in *Hudson* and *Tierney.* Moreover, Roesser contends that these actions amounted to a *per se* violation of the duty of reasonable accommodation to his religious beliefs which Title VII imposes upon the Union and the University.

The UDPU argues that (a) *Hudson* and *Tierney* are inapplicable to this controversy since the CBA between the UDPU and the University bears no indicia of state action under *Hanson,* and (b) in any event, Roesser's desired relief extends beyond that which the *Hudson* procedures were intended to afford, *i.e.,* a fairly determined rebate of the proportion of his dues which the union expends on any non-bargaining activities of which he disapproves.

Contrary to Roesser's assertions, *Hudson* and *Tierney* have little, if any, bearing on whether the UDPU's internal rebate policy is a reasonable accommodation of Roesser's religious beliefs under Title VII. These cases are clearly inapposite to the present case on several grounds.

First, *Hudson* and *Tierney* involved First Amendment challenges to the acts of public employee unions. The procedures in these two cases were derived by reference to the federal Constitution, which was implicated only because state action had been shown. *Railway Employes' Dep't v. Hanson,* 351 U.S. at 232, 76 S.Ct. at 718; *Kolinske v. Lubbers,* 712 F.2d 471, 474–480 (D.C.Cir.1983).[25] The instant lawsuit con-

---

24. The Court in *Hudson* held three protections to be essential to union plans for the accommodation of dissenting fee payors: (1) the avoidance of even temporary use of dissenters' fees for disapproved purposes, (2) the provision to dissenters of information concerning all union expenditures which were not essential to CBA administration, and (3) provision for a "reasonably prompt decision by an impartial decisionmaker" on the merits of objections. *Id.* 475 U.S. at 304–09, 106 S.Ct. at 1075–77.

25. Federal preemption of the state statute and Constitution in *Railway Employes' Dep't v. Hanson, supra,* originated in the express terms of the federal Railway Labor Act. *Hanson* did not address whether the federal Constitution is implicated in private sector dissenter cases, but only considered the Railway Labor Act:

    If private rights are being invaded [on the facts presented here], it is by force of an agreement made pursuant to federal law [the Railway Labor Act] which expressly declares

tests the actions of a union and an employer in the private sector, and cannot directly invoke the protections of the First Amendment because the wrong complained of is not alleged to flow from governmental action.

Second, neither *Hudson* nor *Tierney* limited or invalidated the proportion principle itself, even for public employees. In fact, the *Hudson* and *Tierney* Courts referred to agency fee amounts that "the union [was] unquestionably entitled to retain" under the new procedures, *i.e.*, amounts that "unquestionably reflect[ed] the proportion of the union's budget expended to negotiate and operate the collective bargaining agreement." *Tierney v. City of Toledo*, 824 F.2d at 1502, *citing Chicago Teachers' Union v. Hudson*, 475 U.S. at 310, 106 S.Ct. at 1077–78.

*Hudson* and *Tierney* do not require a union to offer a rebate beyond the extent of a dissenter's objection or to rebate all non-CBA amounts to workers who have lodged objections to certain activities but not to others. *Cf. Abood v. Detroit Board of Education*, 431 U.S. at 235–36, 241, 97 S.Ct. at 1799–1800, 1802–03, (employees who "indicated ... that they opposed ideological expenditures of *any* sort that are unrelated to collective bargaining" were not required to specify the expenditures to which they objected) (emphasis in original). Neither *Hudson* nor its antecedents specifically entitle a dissenting contributor to recover amounts that were used for purposes, to which there has been no objection.

More fundamentally, it does not appear from *Street, Abood,* or *Hudson* that, even under public sector labor agreements, an objection to a particular activity beyond the union's collective bargaining function entitles a dissenting employee to a rebate of all non-collective bargaining amounts, let alone an exemption from agency fees altogether, as a matter of constitutional due process. Thus, even in those factual circumstances where constitutional protections are clearly applicable, the nature of the objection constrains the right to relief.

---

that state law is superseded (citations omitted).... In other words, the federal statute is the source of the power and authority by which any private rights are lost or sacrificed (citations omitted). The enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates, though it takes a private agreement to invoke the federal sanction.
*Id.* 351 U.S. at 232, 76 S.Ct. at 718.
It should be noted that *Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), and *Railway Clerks v. Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963), also involved the Railway Labor Act, and applied the state action analysis which had been put forward in *Hanson.*
The Supreme Court has never resolved whether governmental acquiescence in, or permissive authorization of, private labor union activity outside the Railway Labor Act amounts to state action. *See, e.g., Street,* 367 U.S. at 777, 81 S.Ct. at 1804 (Douglas, J., concurring) ("Since neither Congress nor the state legislatures can abridge [First Amendment] rights, they cannot grant the power to private groups to abridge them. As I read the First Amendment, it forbids any abridgment by government whether directly or indirectly"); *Id.* 367 U.S. at 806–807, 81 S.Ct. at 1818–19 (Frankfurter, J., concurring) ("We must consider the difference between ... compulsion and the absence of compulsion when Congress acts ... in a wholly non-coercive way. Congress has not commanded that the railroads shall employ only those workers who are members of authorized unions ...").
In an important recent re-examination of *Hanson,* the Court in *Kolinske v. Lubbers,* 712 F.2d 471, 474–480 (D.C.Cir.1983), found state action wanting in a United Auto Workers union rule which conditioned the disbursement of strike fund benefits upon affirmative participation in strike activity. The *Kolinske* Court undertook an exhaustive discussion of state action in the labor relations context, and made an important distinction between *Hanson,* in which the right or privilege at issue was created by federal preemption of contrary state law, and other cases which involved statutory permission, but not compulsion, of particular private action. "[I]t is well settled that a state's mere authorization of private conduct does not justify a finding of state action.... While the NLRA provides a framework to assist employees to organize and bargain collectively with their employers, the NLRA is neutral with respect to the content of particular agreements." *Id.* at 478, *citing Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). *Kolinske* observed that *Abood v. Detroit Board of Education, supra,* had never confronted the state action question because it concerned a public employee union. *Id.*
*See also Communications Workers v. Beck,* —— U.S. ——, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988) (further discussed *infra*).

In order for the *Hudson* procedures to make possible the relief which has been requested by Roesser in the case before this Court, a determination would be required—unreasonable in the extreme—that none of the activities of the MEA or NEA were germane to collective bargaining.[26]

Finally, the facts of the instant case would present no question of due process in the determination of a proper proportional rebate even if the University was a governmental entity, and the UDPU was a union within the public sector. It is undisputed that (a) Roesser demanded full exemption from the payment of fees to the state and national organizations with which the UDPU was affiliated, and (b) no rebate would have been satisfactory if it did not grant him permission to give at least that portion of his fees to charity which the UDPU was required to forward to the MEA and NEA. Intervenor's Supplemental Brief, September 1, 1987 (Pl. 130), at 4 & n. 2.[27]

Although the duty of reasonable accommodation under section 701(j) and the duty to afford fair and accurate rebates under *Hudson* are derived from different legal spheres and governed by different standards, it seems clear that, after *Ansonia Board of Education v. Philbrook, supra,* section 701(j) must be read to bar the imposition of any remedy, under whatever procedures it is ordered, which forces a union or an employer to (a) make an accommodation different from a reasonable offer which it has already made, or (b) suffer an undue hardship in the course of an accommodation. Accordingly, this Court concludes that a decisionmaker acting under the *Hudson* rebate procedures (even if they

applied) could not grant Roesser the relief that he seeks without contravening Title VII.

### F.

The Court will now briefly consider *Communications Workers v. Beck,* — U.S. —, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988), in which the Supreme Court held that section 8(a)(3) of the Labor Act, 29 U.S.C. § 158(a)(3), as well as a union's judicially imposed duty of fair representation, *see Steele v. Louisville & Nashville Ry. Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), forbade the exaction of agency fees from a nonmember union shop employee for any non-bargaining activity to which the employee objected.

In the instant case, neither Roesser nor the EEOC alleges a violation of section 8(a)(3) of the Labor Act or a breach of the UDPU's duty of fair representation. However, such allegations would have been rejected by this Court because they fail to state a claim under *Hanson, Abood* or *Hudson.* The extent of Roesser's objection is undisputedly much slighter than the extent of his desired relief.[28] *Beck* specifically construed section 8(a)(3) to permit unions to compel the payment of fees "to the extent necessary to ensure that those who enjoy union-negotiated benefits contribute to their cost." *Id.,* 108 S.Ct. at 2649, *citing Ellis v. Railway Clerks,* 466 U.S. 435, 452 n. 13, 104 S.Ct. 1883, 1894 n. 13, 80 L.Ed.2d 428 (1984); *NLRB v. General Motors Corp.,* 373 U.S. 734, 742, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670 (1963) (union membership requirement has been "whittled down

---

**26.** This Court must reject Roesser's argument, Intervenor's Trial Brief at 20, that "neither the state nor the national organizations [with which the UDPU is affiliated] are the exclusive bargaining representative for the employees at the University of Detroit." *See* Collective Bargaining Agreement, University of Detroit and University of Detroit Professors' Union, August 16, 1981—January 15, 1984, Art. I, section 1.1(b) ("'Union' or 'UDPU' means the University of Detroit Professors' Union, MEA–NEA, AAUP, or the same labor organization designated by another name"), Exhibit A to Roesser Affidavit, *supra* n. 9, at 1.

**27.** *See* Letter from Robert Patrick Roesser to Maryjo Nichols, April 23, 1984, *quoted at* text accompanying n. 6 *supra.*

**28.** This Court has not reached any conclusions with regard to the sincerity of Roesser's religious beliefs. However, the record clearly indicates that Roesser harbored no objection to the union's positions and activities beyond abortion. *See* discussion *supra,* n. 23 and accompanying text; n. 7 and accompanying text.

to its financial core").[29]

Thus *Beck*, even if it was apposite to the instant cause, would not provide a basis for the exemption privilege which Roesser seeks since it affirms the continuing vitality of the proportion principle in the spirit of *Ellis, Street,* and *Hanson.* A proportional rebate is no more a violation of Roesser's rights under the Labor Act after *Beck* than it would have been before the decision was rendered.

### G.

It might appear at first glance that section 19 of the Labor Act, 29 U.S.C. § 169, as amended, validates Roesser's claimed entitlement to a special agency fee exemption. That section, which was added to the Labor Act in 1974 for health care workers only, was extended in 1980 to "any employee[s]" who were covered by the Labor Act. It provides, in pertinent part, as follows:

[a]ny employee who is a member of and adheres to established and traditional teachings of a bona fide religion, body, or sect which has historically held conscientious objections to joining or financially supporting labor organizations shall not be required to join or financially support any labor organization as a condition of employment; except that such employee may be required in a contract between such employees' employer and a labor organization in lieu of periodic dues and initiation fees, to pay a sum equal to such dues and initiation fees to a nonreligious, nonlabor organization charitable fund ...

P.L. 96–593, 94 Stat. 3452 (1980); *see* H.R. Rep. No. 96–496, 96th Cong., 2d Sess. 2, *reprinted in* 1980 U.S.Code Cong. & Admin.News 7158, 7159. The House Report makes the following comments on the statute:

The [NLRA] is based on the concept of majority rule. The union designated or selected for the purposes of collective bargaining "by a majority of the employees in a unit appropriate for such purposes" [under section 9(a) of the Act] is the exclusive bargaining agent for all employees in the bargaining unit[,] and remains such unless and until it is voted out ...

To minimize the problem of the "free rider," that is[,] the employee who would enjoy union representation without paying his fair share of the costs, section 8(a)(3) permits but does not require the employer and the union to agree that all employees must pay fair and reasonable union dues as a condition of continued employment.

This statutory framework, generally fair, has created a conflict between the dues-paying union member on the one hand, and employees who object to the payment of dues because of religious beliefs.

H.R. 4774 [an amendment to section 19 of the NLRA, 29 U.S.C. 169] ... would apply to [persons who can verify] membership in a bona fide religion which historically has held conscientious objection to joining or financially supporting a labor organization. It would permit such a person ... to pay in lieu of periodic dues ... an equivalent sum to a nonreligious charitable fund.

[The bill would accommodate the religious beliefs of persons such as members] of the Seventh Day Adventist Church[,] for example[,] [who] cannot, consistent with the traditional and historic teachings of that church, pay dues to unions.

---

29. Roesser contends that because the MEA and NEA represent many public employees, they are required to accord the procedural benefits specified in *Hudson* to all the employees they represent, whether under public sector contracts or not.

This Court does not believe that such a contention accurately reflects current law. Although *Hudson* mandated certain procedures for dissenting contributors to public employee unions, the majority and the dissent in *Beck* conspicuously avoided any mention of *Hudson*. The *Beck* Court did not decide what rebate adjudication procedures would be appropriate under the Labor Act. However, it clearly stopped short of requiring the importation of the constitutionally derived procedural requirements of *Hudson* into the fair representation equation of the Labor Act.

It appears clear from the legislative history of H.R. 4774 that the amendment to section 19 was designed to bring the Labor Act into conformity with Title VII, as applied to persons whose religions teach against joining unions *per se*. Thus, it may be inferred that Congress did not intend the new section 19 to conflict with the existing reasonable accommodation provisions of Title VII.

■ Although section 19 as amended permits a charitable substitution of the entire amount of dues for persons with religious objections to the essential functions of labor unions, it does not change the operation of the reasonable accommodation requirement of Title VII as it is applied to persons whose religion causes an objection to certain union activities but not to the union's essential collective bargaining functions.[30]

In the instant cause, this Court notes that the National Labor Relations Board (NLRB) refused to issue a Complaint for a violation of section 19 arising out of the University's failure to rehire Roesser after his discharge. The NLRB's General Counsel reached that decision in part because "no valid basis was found to support [Roesser's] contention that Congress intended to broaden the scope of such objections to include any particular objection an employee may have to selected policies of a labor organization." [31]

Thus, even if the amended section 19 requires a full charitable substitution as a minimum reasonable accommodation for the class of workers which has been specified in the statute, the Labor Act does not contemplate a full substitution for workers, such as Roesser, whose objections are confined to specific extra-representational union activities.

There arises a question as to whether an impartial decisionmaker, acting under the procedures in *Chicago Teachers' Union v. Hudson*, 475 U.S. at 304–09, 106 S.Ct. at 1075–77, and *Tierney v. City of Toledo*, 824 F.2d at 1505–06, could construe section 19 to cover religious objections which the objector believes justify a total dues exemption, and award Roesser the relief that he has requested. However, it is apparent that section 19 could not be fairly read by an arbitrator under the *Hudson* standards or by a reviewing court to encompass claims such as Roesser's. The plain meaning of section 19 protects only those workers who have a religious objection to joining unions or contributing financially to labor organizations.

### H.

From the foregoing analysis, it appears clear that the union security provisions of section 8(a)(3) of the Labor Act do not excuse a failure to accommodate an employee's religious beliefs under Title VII. *McDaniel v. Essex International, Inc.*, 571 F.2d at 338.[32] It further appears that section 8(a)(3) does not allow for the taking of funds from a nonmember agency fee payor for any non-CBA use to which the employee objects. *Communications Workers v. Beck*, 108 S.Ct. at 2657. Additionally, the taking of such monies by a public employee union constitutes a violation of the property rights of the dissenter, independent of the Labor Act, and triggers constitutional due process protections. *Chicago Teachers' Union v. Hudson*, 475 U.S. at 302, 106

---

**30.** *McDaniel v. Essex International, Inc.* did not mention section 19, presumably because the cause of action in that case arose two years before the statute was passed in its original version for health care employees, and nearly a decade before it was expanded to protect all employees whose contracts were subject to the Act. However, even a holding that section 19 entitled the employee in *McDaniel* to pay her fees to a charity would not control the case at bar, in which the dissenting contributor's objection is much narrower than that for which the statute provides a remedy.

**31.** Uncontested Facts, Pretrial Order at 6, Paragraph 25.

**32.** "There is simply no support in the legislative history of the [Labor–Management Relations Act of 1947] for the argument that subsections 8(a)(3) and (b)(2) were intended to accommodate the religious practices, beliefs or observances of individual employees." *McDaniel v. Essex International, Inc.*, 571 F.2d at 343, *citing* Remarks of Senator Taft, 93 Cong. Rec. 4886 (1947).

S.Ct. at 1073; *Tierney v. City of Toledo*, 824 F.2d at 1505.

■ However, no court has ever held that the Labor Act or the federal Constitution entitles a religious dissenter to an exemption of more than a fair share which is allocable to his objection. *See, e.g., Communications Workers v. Beck*, 108 S.Ct. at 2655–56; *Chicago Teachers' Union v. Hudson*, 475 U.S. at 301, 106 S.Ct. at 1073; *Abood v. Detroit Board of Education*, 431 U.S. at 240–41, 97 S.Ct. at 1802–03; *Machinists v. Street*, 367 U.S. at 772, 81 S.Ct. at 1801; *Railway Employes' Dep't v. Hanson*, 351 U.S. at 238, 76 S.Ct. at 721. Although *Hanson* and its progeny, including *Street, Hudson* and *Beck*, are inapposite for the reasons that have been outlined above, the entitlements or protections which those decisions afford to individual employees could not be exceeded in the instant case even if they applied.

In *NLRB v. General Motors Corp.*, 373 U.S. 734, 740, 83 S.Ct. 1453, 1458, 10 L.Ed.2d 670 (1963), the Court struck a compromise between the problem of "free riders" and the abuses of compulsory unionism. That compromise permitted unions to exact uniform contributions toward collective bargaining costs from all workers who were covered by agency shop agreements. To hold that any objection to a single union activity beyond collective bargaining should result in a refund of the objector's total agency fee, or any smaller portion thereof beyond that which corresponds to the amount of the union's expenditures on the disfavored activity, creates in some degree the "free rider" problem which was resolved in *General Motors*.

For all of these reasons, this Court concludes that federal law outside Title VII does not afford the procedural or substantive relief which Roesser seeks in the present case.

### IV.

Because the accommodation which was offered by the UDPU was reasonable as a matter of law, the instant case does not squarely present the question of undue hardship. *Ansonia Board of Education v. Philbrook*, 479 U.S. at 68, 107 S.Ct. at 372 ("the statutory inquiry is at an end" once a reasonable accommodation is found to have been offered). However, for the reasons stated below, this Court believes that both of Roesser's proposed accommodations would impose an undue hardship upon the union.[33]

### A.

■ Where the religious discrimination which is alleged under section 701(j) grows out of a collective bargaining contract, the employer and the labor union are under the same duty to accommodate, and the district court must consider hardship to the union as well as to the employer. *Cooper v. General Dynamics Convair Aerospace Division*, 533 F.2d 163, 171 (5th Cir.1976). Although the hardship, which has been specified by section 701(j), is "confined to 'undue hardship on the conduct of the *employer's* business' (emphasis supplied), ... reason argues overwhelmingly that in the structure of this statute Congress could not have thought that for two parties under the same stringent substantive prohibition [against employment discrimination] one has an escape hatch of undue hardship denied to the other...." *Id.* at 172 (Rives, J., concurring).

This Court recognizes that a reading of section 701(j), which provides an undue hardship defense to accommodation by unions and employers, is more than a literal reading of the statute. However, this Court is persuaded by the reasoning of the "consensus majority" in *Cooper v. General Dynamics Convair Aerospace Division*,

---

**33.** Roesser contends that undue hardship to the University has not been shown. The University aserts simply that it was loath to commit what it believed would be a breach of its contract with the UDPU. Deposition of Norman G. McKendrick, S.J., former Vice President for Academic Affairs, University of Detroit (Pl. 103), at 61–64.

However, the UDPU and the University base their positions in the instant cause principally upon allegations of hardship to the union. Thus, this Court need not consider Roesser's contention that his desired accommodation would have caused the University no undue hardship directly.

533 F.2d at 171, that it would be unjust to place unions under the same Title VII duty as employers to accommodate the religious beliefs of individual employees, yet not to allow unions the same hardship defense as employers utilize in cases where an accommodation fails. To hold otherwise would mandate a conclusion that unions (1) can suffer no undue hardships as a result of accommodations under section 701(j), and (2) unlike employers, must grant employees any relief for which *bona fide* religious grounds are asserted, no matter how great the imposition upon their organizational functions under the Labor Act.[34]

### B.

The Supreme Court first considered the "undue hardship" requirement of section 701(j) in *Trans World Airlines v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). In *Hardison*, the Saturday Sabbath of an airline mechanic conflicted with the work schedule of his employer, in which assignments were determined chiefly by seniority. The *Hardison* Court examined section 701(j), its legislative history, and diverse lower court decisions interpreting the statute, and found little or no "guidance for determining the degree of accommodation that is required of an employer." *Id.* at 74 & nn. 9–10, 97 S.Ct. at 2272 & nn. 9–10. Nevertheless, the Court concluded that section 701(j) did not require an employer to violate the seniority provisions of a valid CBA in order to accommodate the religious needs of an employee.

The Court in *Hardison* held:

To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship.... [The dissent's contrary argument] ignores ... the express finding of the District Court that [paying overtime to a replacement or not replacing Hardison]

'would have created an undue burden on the conduct of TWA's business,' ... and it fails to take account of the likelihood that a company as large as TWA may have many employees whose religious observances, like Hardison's, prohibit them from working on Saturdays or Sundays.

*Id.* at 84 & n. 15, 97 S.Ct. at 2277 & n. 15.

### C.

The UDPU contends that to grant Roesser either of his requested accommodations would impose a number of unacceptable hardships upon it. First, because the MEA and NEA exact a contribution from each local according to its size, an exemption for Roesser would require the other members of the UDPU bargaining unit to make up whatever Roesser did not contribute.[35]

Several recent Ninth Circuit cases have held that the loss of the agency fees of a single employee whose religious beliefs forbade the support of unions did not constitute undue hardship to the union since it did not endanger the union's economic health. *Machinists v. Boeing Corp.*, 833 F.2d 165 (9th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1488, 99 L.Ed.2d 715 (1988); *Postal Workers v. Postmaster General*, 781 F.2d 772, 776 (9th Cir.1986); *Anderson v. General Dynamics Convair Aerospace Division*, 589 F.2d 397 (9th Cir. 1978), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *Burns v. Southern Pacific Transportation Co.*, 589 F.2d 403 (9th Cir.1978), *cert. denied,* 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979).

However, like *Tooley v. Martin–Marietta Corp., supra*, the above cases deal with employees' religious objections to joining or supporting labor unions *per se*, rather than objections to particular union activities be-

---

**34.** In view of the holding of *Cooper,* this Court will construe the term "employer" in the cases which are discussed below to mean the employer or the union or both, as appropriate. *See* p. 1331 *supra.*

**35.** It is undisputed that the yearly amount of Roesser's contribution to the MEA and NEA was $288.50 in 1982–83, and 295.00 in 1983–84. *See* n. 3 *supra.* The Plaintiffs argue that the transfer of such a burden to Roesser's approximately 170 fellow employees, Deposition of Robert O'Neil, former President, UDPU, September 9, 1986 (Pl. 104) ("O'Neil Dep."), at 91, was not an undue hardship. EEOC Trial Brief (Pl. 157) at 22.

yond basic bargaining and representation. They do not address whether the same hardship would be burdensome no matter how confined the scope of the objection. They also ignore *Trans World Airlines v. Hardison, supra,* in which the Court assessed the extent of a hardship under section 701(j) only after considering "the likelihood that ... many employees" would seek the benefit granted in the litigated instance. *Id.* 432 U.S. at 84 n. 15, 97 S.Ct. at 2277 n. 15. As *Hardison* suggested, it would be shortsighted for this Court to decide the question of undue hardship without considering the likelihood that other UDPU bargaining unit members would follow in Roesser's footsteps on the abortion issue. That likelihood, it appears, is considerable.[36]

Moreover, this Court discerns no principled distinction between Roesser's objection to his union's position on abortion and the religious objections which an employee might assert to a union's public positions on, *e.g.,* (a) corporal punishment or other aspects of the disciplining of children, (b) sex education, "creationism," or prayer in the curriculum, (c) the employment of teachers with particular lifestyles or beliefs, or (d) the proper role of educational institutions in the advancement of social welfare. Under the rule of accommodation which has been urged by Roesser, full dues exemption would be obligatory for any employee who objected to a union's activities in furtherance of its views on any of these matters, even if the "activity" entailed no effort or expense beyond the adoption of a resolution or bylaw, or the public statement of a union leader.

In view of the foregoing, it is the considered judgment of this Court that to grant Roesser his requested relief would raise the substantial likelihood of the "widespread refusal to pay union dues" which has been held "sufficient to establish undue hardship" under section 701(j).[37] *Tooley v. Martin–Marietta Corp.,* 648 F.2d at 1243–44; *Yott v. North American Rockwell Corp.,* 602 F.2d 904, 908–09 (9th Cir.), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1316, 63 L.Ed.2d 761 (1979); *Burns v. Southern Pacific Transportation Co.,* 589 F.2d at 407.

This Court also believes that even the threat of such a "widespread refusal" would chill union speech, which is protected by the First Amendment just as is the free expression of the ideas of individuals. *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978) ("the inherent worth of the speech in terms of its capacity for informing the public does not depend on the identity of its source, whether corporation, association, union, or individual"); *Machinists v. Street,* 367 U.S. at 773, 81 S.Ct. at 1802 ("the [union] majority.... has an interest in stating its views without being silenced by the dissenters"). Roesser's application to this Court, if granted, would essentially force the union to choose between taking a public position on any issue to which a sincere religious objection could be made, and warding off a proliferation of dues exemption requests based on religious objections to those positions.

To the extent that any public utterance by a labor union must be tailored in order to avoid dues exemption controversies rath-

---

**36.** *See* O'Neil Dep. at 8–9 ("The major hardship is that Professor Roesser is not the only person on the campus who objects strenuously to the abortion, pro-choice or reproductive freedom position of MEA and NEA. We have had many, many statements in public forums, meetings. The gist of them is let us disaffiliate from MEA and NEA because they support abortion, and the proportion of Catholics on our faculty is about fifty percent"); O'Neil Dep. at 23 (Roesser's belief against abortion was "a sincerely held religious belief that most of us share in").
  *Compare Smith v. Pyro Mining Co.,* 827 F.2d 1081, 1086 (6th Cir. (1987) (evidence of undue hardship must be more than mere speculation),

with *Draper v. United States Pipe and Foundry Co.,* 527 F.2d 515, 520 (6th Cir.1975) (undue hardship may be established without actually putting an accommodation into effect).

**37.** Fraudulent or abusive availment of the exemption is not the only, or even the primary, ground upon which a labor union may have just cause to fear the proliferation of religion-based claims. Even a exemption policy, which was limited to sincere objections, would risk a "widespread refusal to pay union dues"—a situation which this Court believes is likely in this case. *See* discussion *infra.*

er than to further the unity of the work force for the purpose of maintaining labor peace, the stability of industrial and labor relations in the United States stands imperiled. Title VII could not have been intended, and will not be construed by this Court, to enable individual dissenters to brandish their religious objections as a sword against the collective expression of the views of organized labor in the marketplace of ideas.

## V.

Finally, this Court must briefly consider two arguments which invoke the Establishment Clause of the First Amendment. First, the Defendants contend that the University, as a religious institution, falls within the ambit of section 702 of Title VII, 42 U.S.C. § 2000e–1, and is exempt from the requirement of section 701(j) to offer a reasonable accommodation to an employee who asserts a religious conflict with some facet of his employment.

This Court must reject such a contention. Section 702 was intended to allow religious institutions to require an adherence to certain beliefs as a precondition of employment, but not to permit them to evade the reasonable accommodation requirements of section 701(j). Although the University is undisputedly a Roman Catholic institution and a "religious ... educational institution" within the meaning of section 702, it does not contend that Roesser failed to meet its standards for adherence to the Roman Catholic Church or to the Jesuit order, the Society of Jesus. Ironically, the University felt forced to discharge Roesser precisely because his beliefs as a Catholic conflicted with its legal duties to the UDPU. Cf. Corporation of the Presiding Bishop v. Amos, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987).

The UDPU suggests that section 701(j), if construed or applied to permit an individual employee, upon the lodging of a religious objection to a single union position unrelated to collective bargaining, to (a) decline to pay all agency fees, or (b) dictate the allocations which his union makes to its state and national organizations, would violate the Establishment Clause to the extent of such a construction or application.

In *EEOC v. Ithaca Industries, Inc.*, 829 F.2d 519 (4th Cir.1987), *after remand*, 849 F.2d 116 (4th Cir.1988), and in *Nottelson v. Smith Steel Workers*, 643 F.2d 445 (9th Cir.1981), section 701(j) on its face was held not to violate the Establishment Clause. However, neither *Ithaca Industries, Nottelson*, nor *Yott v. North American Rockwell Corp.*, *supra*, considered the implications of applying section 701(j) to permit the relief which Roesser requests in the present case.

In view of the uncertain state of the law in this area, this Court declines to consider whether section 701(j) would excessively entangle the federal Government with an establishment of religion, *Lemon v. Kurtzman*, 403 U.S. 602, 619, 91 S.Ct. 2105, 2114, 29 L.Ed.2d 745 (1971), if that section was applied to permit the relief which Roesser has sought. The Court notes that a statute is to be construed, as far as possible, so as not to engender constitutional conflict. *Communications Workers v. Beck*, 108 S.Ct. at 2657. Since this Court has determined that the UDPU offer to Roesser was sufficient under applicable law, the union's Establishment Clause arguments will not be addressed.

## VI.

For the reasons which have been stated in this Opinion, this Court concludes that there are no genuine issues of a material fact which remain for trial in the instant cause. Fed.R.Civ.P. 56(c), (e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Accordingly, Roesser's motion for partial summary judgment is denied. The motion of the UDPU and the University for summary judgment is granted, and the instant case is dismissed. This constitutes a final Order of the Court.

IT IS SO ORDERED.